**Alan Michal NICKERSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–08–01052–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

May 4, 2010.

Discretionary Review Refused
Aug. 25, 2010.

R.P. Cornelius, Houston, for appellant.

Donald W. Rogers, Jr., Houston, for appellee.

Panel consists of Justices YATES, FROST, and BROWN.

## OPINION

JEFFREY V. BROWN, Justice.

A jury convicted Alan Michal Nickerson of capital murder and he was sentenced to life imprisonment. In nine issues, Nickerson contends that the trial court erred by: (1) allowing Nickerson's statements to police officers to be admitted into evidence; (2) failing to instruct the jury on the lesser-included offense of felony murder; (3) allowing a police officer to testify about inadmissible hearsay statements; and (4) failing to grant a mistrial when the prosecutor repeatedly argued outside the record. We affirm.

## I

At about nine o'clock on the evening of November 29, 2007, neighbors Raul Duran and Jorge Lemus were standing in the parking lot of their apartment complex having a conversation. The complainant, Cartrell Odom, who also lived in the apartment complex, approached them to join the discussion. The complainant was a peace officer, but he was dressed in plain clothing that night. The three men had been talking for about thirty minutes when four African–American, teenaged males walked toward them in a single-file line. Lemus testified that the first teenager wore a white hoodie with camouflage patterns, but the other three males wore black hoodies. Duran testified that the teenagers encircled the three men and drew firearms. It appeared to Lemus the teenager wearing the white hoodie was in charge because he was "doing all the talking," including directing the three men to get down and proclaiming, "This is a fucking robbery." Both Lemus and Duran got down on the ground. Duran testified that he could feel a gun pressed against his head, so he gave the four males everything in his pockets, including his cell phone. Lemus also relinquished his property. Lemus stated that although he was on the ground, he kept his head facing forward and had a "very clear view of everything [that was] going on."

Lemus stated that he witnessed the complainant start to get down on the ground, but after being struck several times with a gun, the complainant stood up and stated, "You cannot treat me like this." Lemus testified that the complainant began to argue with the teenager in the white hoodie, who then pointed his gun at the complainant. The complainant hit his assailant's hand, turned around, and began to run. Lemus stated that he heard a gunshot fired in the complainant's direction. Then, the assailant chased the complainant, and he fired another shot causing the complainant to fall to the ground. Lemus testified that the assailant who shot the complainant walked over to the complainant's body and shot him in the head—"a point-blank shot." Albert Chu, assistant medical examiner, later performed the autopsy on the complainant's body and testified that both shots, to the complainant's back and head, were fatal wounds. After the third shot was fired, the four robbers jumped into a black sedan and drove out of the apartment complex.

After the shooting, several Houston Police Department ("HPD") officers arrived on the scene, including Sergeant Tony Huynh. Sergeant Huynh testified that when he discovered Duran's cell phone was stolen, he and U.S. Marshal Lowenstein decided to track or "ping" the cell phone to find its location. Sergeant Huynh stated that he followed Lowenstein in an unmarked vehicle to 4839 Redbud. After arriving at the address, Sergeant Huynh, HPD Sergeant Mark Newcomb, and two uniformed officers knocked on the front door and requested permission to enter and speak with the young African–American male in the home. Loveless Nickerson, mother of Alan Michal Nickerson, gave the officers permission to enter the home and speak with her son. Once in the home, Sergeant Newcomb found Nickerson, who appeared to be sleeping. He testified that when he tried to call Duran's cell phone, it began to ring from underneath Nickerson's pillow. The officers asked Nickerson if he was willing to accompany them to the police station. Nickerson agreed to go with the officers and speak with them.

Sergeant Newcomb testified that once they arrived at the police station, Nickerson was registered as a visitor and was not under arrest. Sergeant Newcomb stated

that he read Nickerson his statutory warnings, and he taped an interview in which Nickerson confessed he was involved in the robbery as the getaway driver. After Nickerson's statement, HPD Officer Alan Brown took Nickerson before a magistrate judge to have his legal warnings administered again. Officer Brown testified that Nickerson was now in custody. During the course of the day, Nickerson gave four different statements to Officer Brown. After the second statement, in which Nickerson admitted to wearing the white hoodie, Officer Brown went to Nickerson's home, searched it, and found the white hoodie. Finally, after the fourth statement, Nickerson admitted that he was the person who shot the complainant.

Before trial, Nickerson requested a hearing on his motion to suppress his statements. The trial court held the hearing and denied Nickerson's motion to suppress. After hearing all of the evidence at trial, the jury convicted Nickerson of capital murder. Nickerson was sentenced to confinement for life. This appeal followed.

## II

In his first issue, Nickerson argues that he was illegally arrested at his home and placed in custody; therefore, his statements to the police officers were involuntary. He complains that the trial court erred by allowing his statements to be admitted into evidence. The State contends that Nickerson was not unlawfully arrested because the evidence at trial proves he voluntarily accompanied the officers to the police station.

We review the trial court's denial or admission of the evidence using an abuse-of-discretion standard. *See Apolinar v. State*, 155 S.W.3d 184, 186 (Tex.Crim.App. 2005); *Webb v. State*, 991 S.W.2d 408, 418 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd). While a trial court has substantial

discretion, it can abuse its discretion if its rulings are outside of "that zone within which reasonable persons might disagree." *Webb*, 991 S.W.2d at 418; *see Apolinar*, 155 S.W.3d at 186. A trial court's ruling on the admissibility of evidence will be upheld if the record reasonably supports the ruling. *Willover v. State*, 70 S.W.3d 841, 845 (Tex.Crim.App.2002).

Additionally, a trial court's ultimate custody determination presents a mixed question of law and fact. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex.Crim.App.2007) (citing *Thompson v. Keohane*, 516 U.S. 99, 112–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). We afford almost total deference to the trial court's determination when questions of historical facts are based on an evaluation of credibility and demeanor. *Id.* at 526–27 (citing *Ripkowski v. State*, 61 S.W.3d 378, 381 (Tex.Crim.App.2001)). We review de novo, however, those mixed questions of law and fact not turning on credibility or demeanor. *Id.* at 527.

### Was Nickerson in Custody?

Article 38.22 of the Texas Code of Criminal Procedure lays out the requirements to admit a person's oral or written statements made during a custodial interrogation, as well as specifically exempts from its requirements statements made outside of custody or made voluntarily. Tex.Code Crim. Proc. Ann. art. 38.22 (Vernon 2005); *Herrera*, 241 S.W.3d at 526. "A person is arrested when he has been actually placed under restraint or taken into custody by an officer or person executing a warrant of arrest, or by an officer or person arresting without a warrant." Tex.Code Crim. Proc. art. 15.22 (Vernon 2005). A person is in custody if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with formal arrest. *Herrera*,

241 S.W.3d at 525; *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996); *Turner v. State*, 252 S.W.3d 571, 576 (Tex. App.-Houston [14th Dist.] 2008, pet. ref'd), *cert. denied*, —— U.S. ——, 129 S.Ct. 1325, 173 L.Ed.2d 598 (2009). Under the "reasonable person" standard, we assume that person is innocent. *Dowthitt*, 931 S.W.2d at 254; *Turner*, 252 S.W.3d at 576. When we review whether a person was in custody, our review includes an examination of all of the objective circumstances surrounding the questioning. *Herrera*, 241 S.W.3d at 525–26 (citing *Stansbury v. California*, 511 U.S. 318, 323, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)).

The Court of Criminal Appeals has recognized four factors in deciding whether a person is in custody: (1) probable cause to arrest; (2) subjective intent of the police; (3) focus of the investigation; and (4) subjective belief of the defendant. *Dowthitt*, 931 S.W.2d at 254; *Turner*, 252 S.W.3d at 576. But factors two and four are relevant only if they are manifested in actions or words of law-enforcement officers. *Dowthitt*, 931 S.W.2d at 254. Furthermore, an interrogation may be noncustodial when it begins, but then later rise to the level of a custodial interrogation. *Id.* at 255; *Turner*, 252 S.W.3d at 577.

The Court of Criminal Appeals has also established four general situations which may constitute custody: (1) if the suspect is physically deprived of his freedom in any significant way; (2) if a law-enforcement officer tells the suspect not to leave; (3) if a law-enforcement officer creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) there is probable cause to arrest the suspect and the law-enforcement officer did not tell the suspect he is free to leave. *Gardner v. State*, 306 S.W.3d 274, 293–94 (Tex.Crim.App.2009); *Dowthitt*, 931

S.W.2d at 255; *Turner*, 252 S.W.3d at 577. In all four situations, there must be a restriction of freedom of movement that is tantamount to an arrest. *See Dowthitt*, 931 S.W.2d at 255. In the fourth circumstance, an officer's subjective intent to arrest is not relevant to our examination unless the officer's subjective intent was somehow conveyed to the suspect. *Dowthitt*, 931 S.W.2d at 255; *Turner*, 252 S.W.3d at 577. Additionally, courts have emphasized that stationhouse questioning does not, in and of itself, constitute custody. *Turner*, 252 S.W.3d at 576–77.

"[W]hen a person voluntarily accompanies police officers, who are then only in the process of investigating a crime, to a certain location, and he knows or should know that the police officers suspect he may have committed or may be implicated in committing the crime, we are unable to hold that under the circumstance such person is in custody." *Turner*, 252 S.W.3d at 579–80 (citing *Dancy v. State*, 728 S.W.2d 772, 778–79 (Tex.Crim.App. 1987)) (holding that although the defendant was handcuffed for officer-safety reasons before he was placed in the backseat of an unmarked vehicle, the defendant had already consented to voluntarily accompany the officers to the station; therefore, the defendant was not in custody when he gave his statements to the officers). If police officers invite or request a person to speak with them, and the person is acting on this request on his own accord without force, threat, or coercion, then the act is voluntary and the person is not in custody. *Id.* at 580.

During the hearing on the motion to suppress, Sergeant Newcomb recounted that he, Sergeant Huynh, and two uniformed officers knocked on Nickerson's front door and requested permission to enter the home and speak with Nickerson. Sergeant Newcomb admitted, however,

that although only four officers entered the home, about twenty police officers were in the neighborhood when Nickerson's mother opened the front door. Sergeant Newcomb testified that Nickerson's mother gave the officers permission to enter the home and speak with Nickerson. Additionally, Sergeant Newcomb stated that Nickerson voluntarily agreed to go with the officers, the officers never drew their weapons, and Nickerson was not placed in handcuffs. Furthermore, Nickerson was not driven to the police station in a marked police vehicle. Sergeant Newcomb testified that it was not until after Nickerson told him about the robbery that he had probable cause to place Nickerson into custody.

Nickerson's sister and mother testified that there were more than four police officers present in and around their home when the officers asked permission to speak to Nickerson. Nickerson's sister stated that there were at least twenty officers present that night, including ten officers inside her home. She testified the uniformed officers had their guns drawn, and her brother appeared to be scared and nervous. Nickerson's sister stated that she saw the officers tape brown bags on her brother's hands, but she could not recall if he was handcuffed. Nickerson's mother, however, testified that Nickerson was indeed handcuffed. She also recalled Nickerson being escorted to the back of a marked police vehicle, although she admitted she was "not a hundred percent sure." Contrary to her daughter's testimony, Nickerson's mother testified she never saw any of the officers pull their guns out of their holsters. But Nickerson's sister and mother agreed that Nickerson was not threatened or forced to go with the police officers, and he accompanied the police on his own accord. Nickerson's sister even admitted there was no reason to believe her brother's statements to the police were anything but voluntary statements.

According to Sergeant Newcomb, "I spoke with [Nickerson] and asked him if he'd be willing to come downtown and speak with us ... [about his] possession of [Duran's] phone." Sergeant Newcomb, emphasizing that Nickerson was not under arrest, testified that Nickerson agreed to accompany him to the police station. Sergeant Newcomb even stated that when he was at Nickerson's home, he did not have probable cause to arrest Nickerson on either aggravated robbery or capital murder. Furthermore, Sergeant Newcomb testified that if Nickerson had been in custody, he would have been handcuffed and transported in a marked police vehicle. Although Nickerson's mother testified that Nickerson was handcuffed and Nickerson's sister stated Nickerson appeared scared and nervous, both agreed Nickerson accompanied the police officers voluntarily without threat, force, or coercion. Even though the witnesses' versions of the account differed, the trial court was in the best position to evaluate the credibility of the witnesses and was free to believe or disbelieve the testimony. *See Mason v. State,* 116 S.W.3d 248, 256 (Tex.App.-Houston [14th Dist.] 2003, pet. ref'd). Based on the evidence, Nickerson was never physically deprived of his freedom in any significant way, never told he could not leave, never restricted in his movement to amount to an arrest, nor was there probable cause to arrest him at his home. *See Gardner,* 306 S.W.3d at 293–94. Nickerson was not illegally arrested or in custody when he was escorted from his home. We hold the trial court did not abuse its discretion in concluding Nickerson was not in custody or in admitting the statements into evidence. Accordingly, we overrule Nickerson's first issue.

### Were Nickersons Statements Voluntary?

In his second issue, Nickerson contends that he involuntarily gave his statements to police officers during his four interviews; therefore, the trial court erred because the statements should not have been admitted as evidence. The State first asserts that Nickerson failed to preserve his contention of voluntariness for appeal, so this argument is waived. But even if Nickerson properly preserved this issue, the State claims that Nickerson failed to properly brief the issue, and therefore he has waived his argument. Finally, if Nickerson has not waived the issue, the State contends that there is no evidence to demonstrate Nickerson's statements to Officer Brown were anything but voluntary.

The State complains that Nickerson has waived this argument because he never asserted that his statements were involuntary during the hearing on his motion to suppress. The Texas Rules of Appellate Procedure require a party to preserve error for appellate review by demonstrating the error on the record. Tex.R.App. P. 33.1(a); *see Broxton v. State*, 909 S.W.2d 912, 918 (Tex.Crim.App. 1995). The party must make the complaint, objection, or motion in a timely manner and state[ ] the grounds for the ruling that the complaining party [seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint. Tex.R.App. P. 33.1(a)(1)(A). If a party's objection at trial does not correspond with its issue on appeal, the party has waived the issue. *Broxton*, 909 S.W.2d at 918. Although in his closing statement at the hearing, Nickersons attorney solely argued the illegal-arrest issue, both Nickersons motion to suppress and questions during the hearing raised the complaint of involuntariness. The State incorrectly argues Nickersons objection at trial does not comport with his complaint on appeal. Additionally, Nickerson has cited to the record and provided this court with authority to support his contention, so he has not waived his argument due to briefing waiver as the State contends. *See* Tex.R.App. P. 38.1(i).

Article 38.21 of the Texas Code of Criminal Procedure provides that a defendants statements may be used against him if it appears that the same was freely and voluntarily made without compulsion or persuasion. Tex.Code Crim. Proc. Ann. art. 38.21 (Vernon 2005); *see Martinez v. State*, 127 S.W.3d 792, 794 (Tex.Crim.App.2004). Section 3 of Article 38.22 provides that if a defendants statement was made as a result of custodial interrogation, then the statement is inadmissible unless, among other requirements: (1) the electronic recording of the defendants statements shows the defendant received certain admonishments required under section 2 of Article 38.22; and (2) the defendant knowingly, intelligently, and voluntarily waived those rights. *See* Tex.Code Crim. Proc. Ann. art. 38.22, § 3(a). A statement is involuntary if it was taken in violation of due process or due course of the law because the statement was not freely given due to coercion, force, or improper influence. *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim.App.1996). To determine whether a statement was made voluntarily, courts examine the totality of the circumstances surrounding the acquisition of the statement. *Delao v. State*, 235 S.W.3d 235, 239 (Tex.Crim.App.2007); *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex.Crim.App.2000); *Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim.App.1997). These circumstances can include length of detention, denial of access to family members, lack of sleep, and lack of food. *See Smith v. State*, 779

S.W.2d 417, 428–29 (Tex.Crim.App.1989) (discussing lack of food and concluding eight hours of questioning without food did not render the confession involuntary because the defendant was willing to continue the interview); *Barney v. State*, 698 S.W.2d 114, 120, 121 (Tex.Crim.App.1985) (discussing sleep deprivation and deciding the confession was voluntary even though the defendant had not slept for sixteen hours); *Gomes v. State*, 9 S.W.3d 373, 377 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd) (discussing length of detention and denial of access to family). Nickerson argues that he was interrogated for more than six hours, he never slept during his ten-to-twelve hours in custody, he was fed just once during his duration in custody, and he had very little time to speak with his family members. We review the record for evidence to determine if Nickerson voluntarily gave his statements.

During the hearing on the motion to suppress, Officer Brown testified that he knew Nickerson was in custody before he began interviewing him. He stated that he took Nickerson before a magistrate judge to receive his statutory warnings. Officer Brown also gave Nickerson his statutory warnings before each of his four interviews with Nickerson, and Nickerson waived his rights each time. Additionally, Officer Brown emphasized that Nickerson neither requested an attorney nor gave any indication he did not want to speak with Officer Brown. Officer Brown stated that he began his first interview with Nickerson at 8:44 a.m. and ended his last interview with Nickerson at 4:21 p.m. But the record does not reflect that Officer Brown interviewed Nickerson continuously during that entire time period. To the contrary, Officer Brown's testimony in the record shows the first interview lasted nineteen minutes and the fourth interview lasted nine minutes. Furthermore, the audiotapes in the record indicate the second interview was seventeen minutes and fifteen seconds and the third interview was four minutes and forty-seven seconds. In total, the four interviews lasted about fifty minutes. Additionally, as the State emphasizes in its brief, Officer Brown "conduct[ed] other activities apart from questioning" Nickerson during Nickerson's time in custody. Some of the activities included taking Nickerson to the magistrate judge, providing food to Nickerson, and escorting Nickerson to his home to retrieve the white hoodie.

Nickerson argues that he was denied access to his family members during his time in custody. But the record does not demonstrate that Nickerson requested to speak to his family members or that any officer specifically denied Nickerson access to them. Furthermore, Officer Brown allowed Nickerson to speak to members of his family when Officer Brown went to Nickerson's home to search for evidence.

Additionally, Nickerson asserts that he was denied food during the interviews. The record reflects that before the first interview, Officer Brown gave Nickerson a McDonald's meal to eat. The record is silent, however, as to whether Nickerson either ate again or requested to eat again.

Finally, Nickerson contends that he was sleep deprived while he was at the police station. The record, however, reflects Officer Brown knew Nickerson did not sleep from the time he began to interview Nickerson at 8:44 a.m. until he placed Nickerson in the city jail at 1:36 p.m. But Officer Brown did not know whether Nickerson slept when he was in the city jail between his third and fourth statements.

In the trial court's findings of fact and conclusions of law, the court found Nickerson's statements were voluntary and made "without any threats, improper influences, any promises, persuasion or compulsion, or

any police misconduct of any kind, and after [Nickerson] knowingly and intelligently waived the presence of counsel and his right to remain silent." The trial court also found that Nickerson's confessions were admissible evidence under article 38.22 of the Texas Code of Criminal Procedure. After reviewing the evidence and based on the totality of the circumstances, we agree with the trial court and conclude the trial court did not abuse its discretion in allowing the statements to be admitted into evidence because Nickerson made them voluntarily and was given his statutory warnings before each statement. Thus, we overrule Nickerson's second issue.

## III

### Should Felony Murder Have Been Submitted as a Lesser–Included Offense?

In Nickerson's third issue, he contends that the trial court erred by failing to charge the jury on the lesser-included offense of felony murder. In response, the State argues that the evidence introduced at trial did not raise felony murder. In deciding whether the jury should have been charged on a lesser-included offense, we apply a two-prong test. *Segundo v. State*, 270 S.W.3d 79, 90 (Tex.Crim.App. 2008), *cert. denied,* —— U.S. ——, 130 S.Ct. 53, 175 L.Ed.2d 43 (2009); *see Hall v. State*, 225 S.W.3d 524, 528 (Tex.Crim. App.2007). First, we determine if the offense is a lesser-included offense of the alleged offense. *Salazar v. State*, 284 S.W.3d 874, 875–76 (Tex.Crim.App.2009); *Hall*, 225 S.W.3d at 526, 535 (holding the sole test to decide the first step of the two-prong test is the cognate-pleadings approach, which examines the elements of the offense and the facts in the charging instrument). Second, we determine if there is some evidence in the record "from which a rational jury could acquit the de-

fendant of the greater offense while convicting him of the lesser included offense." *Segundo,* 270 S.W.3d at 90–91. The lesser-included offense is only an option if the evidence establishes it as a valid, rational alternative to the charged offense. *Id.* at 91 (citing *Arevalo v. State*, 943 S.W.2d 887, 889 (Tex.Crim.App.1997)). But the Court of Criminal Appeals has held that anything more than a scintilla of evidence can be enough to afford the defendant a lesser-included charge. *Hall*, 225 S.W.3d at 536.

A person commits the offense of capital murder if he intentionally commits the murder in the course of committing or attempting to commit a robbery. Tex. Penal Code Ann. § 19.03(a)(2) (Vernon 2003 & Supp.2009). A person commits felony murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in the furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." *Id.* § 19.02(b)(3) (Vernon 2003). Intent to kill is the element that differentiates these two offenses. *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex.Crim.App.1999).

Because it is well-established that felony murder is a lesser-included offense of capital murder, and the State concedes this point, the first prong of the test is met. *See Threadgill v. State*, 146 S.W.3d 654, 665 (Tex.Crim.App.2004). In analyzing the second prong of the test, if evidence from any source raises the issue of a lesser-included offense, then the charge must contain the lesser-included offense. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim.App.1992) (per curiam). Here, the critical question is whether Nickerson had the intent only to rob and not the intent to kill. *See Salinas v. State*, 163 S.W.3d 734, 742 (Tex.Crim.App.2005). What Nicker-

son anticipated before the offense is irrelevant. *See Fuentes,* 991 S.W.2d at 273. "The 'possibility that initially or at some point during the commission of the robbery the offender did not have an intent to cause death does not amount to evidence that the offender did not intend to cause the [complainant's] death when the murder was committed.'" *Id.* (quoting *Rousseau v. State,* 855 S.W.2d 666, 674 (Tex.Crim.App. 1993)).

In *Mathis v. State,* the appellant shot three people, killing two and paralyzing the third. 67 S.W.3d 918, 921 (Tex.Crim. App.2002). The appellant, who had been charged with murder, argued that the jury charge should have included an instruction on the lesser-included charge of manslaughter because he acted recklessly with the gun, and he did not intend to kill anyone. *Id.* at 925. But the court concluded the appellant "admitted to aiming and firing the gun." *Id.* at 926. Although the appellant wanted a lesser-included charge, "[a]part from appellant's testimony that he did not intend to kill anyone, there was no other evidence in support of such theory, and in fact the evidence refuted that testimony." *Id.* The court, therefore, held that an instruction on a lesser-included charge of manslaughter was not appropriate. *Id.*

In *Gonzalez v. State,* two men entered a convenience store and demanded money from the store clerk. 296 S.W.3d 620, 624 (Tex.App.-El Paso 2009, pet. ref'd). After the appellant took the money from the clerk, the other man fired a shot into the clerk's chest, killing him. *Id.* at 625. The two men then fled the scene. *Id.* at 626. The appellant was charged with capital murder, but he requested an instruction on the lesser-included offenses of felony murder or manslaughter. *Id.* at 625. The appellant argued the gun fired accidentally, and the other man did not intend to kill

the clerk. *Id.* at 626. Even though the videotape of the robbery may have shown at some point during the commission of the crime the other man did not intend to kill the clerk, the El Paso court of appeals concluded that it did not amount to evidence that there was no intent at the time of the shooting. *Id.* Additionally, the fact that the man shot the clerk and then fled the scene supported the theory that there was intent to kill. *Id.* at 626–27. Thus, the trial court correctly refused to instruct the jury on a lesser-included charge of felony murder or manslaughter. *Id.* at 627.

During Nickerson's four statements to Officer Brown, he stated:

> I had the gun to the back of [the complainant's] head while I was searching him. He was twitching and moving, so I hit him one time, then after I got the cell phones and money from the two Hispanic males, [the complainant] got up. He tussled with me and reached for the gun trying to snatch the gun out of my hand. I backed up, he lunged towards me and I shot … I shot once. Then he came at me again, then he just ran past me and I shot again.

Officer Brown then asked Nickerson, "How many more times did you shoot?" Nickerson replied, "Just two, just twice." Nickerson also stated that he never had any intention for the complainant to get shot, his "intention was to put a gun to [the complainant's] head and take his belongings." Nickerson argues this statement demonstrates that there was a struggle for the gun and that he did not intend to kill the complainant.

The State asserts that this statement does not indicate the shooting was accidental. In his statement, Nickerson specifically acknowledges that the complainant did not fall to the ground until the second shot was fired. The second shot was fired

after the complainant had already lunged for the gun and was running away from Nickerson. Lemus testified that the teenager, who was shooting at the complainant, began to chase the complainant and fired the second shot, which caused the complainant to fall to the ground. Lemus stated that the teenager then walked over to the complainant's body and shot him in the head—"a point-blank shot." The medical examiner testified that both shots, to the complainant's back and head, were fatal wounds. Even though the testimony may indicate that Nickerson's first shot was accidental, the evidence does not show the second shot to the complainant's back or the third shot to his head were accidental, but rather intentional.

Because there is not sufficient evidence from which a jury could rationally acquit Nickerson of capital murder while convicting him of felony murder, the second prong of the test fails. Thus, we hold the trial court did not err in refusing to instruct the jury on the lesser-included charge of felony murder. Accordingly, we overrule Nickerson's third issue.

## IV

### Inadmissible Hearsay?

In his fourth issue, Nickerson complains the trial court erred when it allowed testimony that one of the complainant's phones was stolen from the scene to be admitted into evidence. He specifically contends that the testimony constitutes hearsay and is therefore inadmissible. The State argues that the statements are not being offered for the truth of the matter asserted and the evidence was admitted elsewhere during the trial without complaint. We review the trial court's decision to admit the statements using an abuse-of-discretion standard. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim.App.2006); *Angleton v. State*, 971

S.W.2d 65, 67 (Tex.Crim.App.1998). Even though a trial court has substantial discretion, it can abuse its discretion if its rulings are outside "'the zone of reasonable disagreement.'" *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex.Crim.App.2001). A trial court's ruling on the admissibility of evidence will be upheld if the record reasonably supports the ruling. *Willover*, 70 S.W.3d at 845.

An out-of-court statement offered into evidence to prove the truth of the matter asserted is hearsay. Tex.R. Evid. 801(d). Hence, a statement not offered to prove the truth of the matter asserted, but offered for some other reason, is not hearsay. *Guidry v. State*, 9 S.W.3d 133, 152 (Tex.Crim.App.1999); *see Dinkins v. State*, 894 S.W.2d 330, 347 (Tex.Crim.App.1995). The Court of Criminal Appeals has concluded that if a statement is introduced to explain how a defendant became a suspect or how the investigation focused on a defendant, then the statement is not hearsay because it is not offered for the truth of the matter asserted. *Dinkins*, 894 S.W.2d at 347 (holding an appointment book and patient application were not offered for the truth of the matter asserted, but instead the evidence was offered to show how the appellant became a suspect of the investigation); *Jones v. State*, 843 S.W.2d 487, 499 (Tex.Crim.App.1992), *abrogated on other grounds by Maxwell v. State*, 48 S.W.3d 196 (Tex.Crim.App.2001) (holding testimony was not hearsay because it was not offered for the truth of the matter asserted, but to explain how the police officer began to suspect the appellant, seek an arrest warrant, and finally arrest him); *see also Cano v. State*, 3 S.W.3d 99, 110 (Tex.App.-Corpus Christi 1999, pet. ref'd) (deciding that the testimony was not being offered to prove drugs were literally being distributed, but rather to show why the officers focused their investigation on the

appellants). "This type of testimony assists the jury's understanding of the events by providing context for the police officer's actions." *Cano*, 3 S.W.3d at 110.

While Officer Huynh was testifying, the prosecutor asked him about the first break in the case. Officer Huynh began to testify that he was instructed to follow up on a phone number that belonged to one of the complainants. Nickerson objected, arguing that for Officer Huynh to state who owned the cell phone would amount to hearsay. The trial court overruled the objection, and Officer Huynh testified the stolen phone belonged to one of the three men who were robbed. The prosecutor then asked Officer Huynh about the purpose of inquiring about the phone, and Nickerson lodged another hearsay objection. The trial court again overruled the objection, and Officer Huynh testified the purpose was to be able to track or "ping" the phone to discover its location. The phone pings eventually led officers to Nickerson's home. After Nickerson's mother allowed the officers to enter the home and gave them permission to speak to Nickerson, the officers discovered Duran's stolen phone under Nickerson's pillow.

In maintaining that Officer Huynh's testimony about the cell phone was improperly admitted, Nickerson relies solely on *Morin v. State*, 960 S.W.2d 132, 138 (Tex. App.-Corpus Christi 1997, no pet.). In *Morin*, the court held that "[c]ourts are to discriminate between cases where some hearsay is allowed to explain the officer's actions from those cases where such hearsay is inadmissible based on the degree to which the actions of the police officer have been challenged by the defendant." *Id.* But Nickerson's reliance on *Morin* is mis-

placed. In that case, the Corpus Christi court of appeals determined that the officer's testimony did not even explain how the appellant became a suspect; the testimony served only to prove the truth of the matter asserted, and was thus hearsay. *Id.*

■ If the State elicits testimony to explain how a defendant originally became a suspect, then the testimony is not hearsay because it is not for the truth of the matter asserted. *See Dinkins*, 894 S.W.2d at 347; *Jones*, 843 S.W.2d at 499. Our review of the evidence leads us to conclude that the complained-of testimony established how Nickerson became a suspect; therefore, it is not hearsay.

■ Additionally, the Texas Rules of Appellate Procedure require a party to preserve error for appellate review by demonstrating the error on the record. Tex.R.App. P. 33.1(a). The objection must be timely, proper, and specific. *Moff v. State*, 131 S.W.3d 485, 489 (Tex.Crim.App. 2004) (explaining how the objection must be specific unless the particular ground is apparent from the context). A party must continue to object every time the inadmissible evidence is offered. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex.Crim.App. 2003) (citing *Ethington v. State*, 819 S.W.2d 854, 858 (Tex.Crim.App.1991)).[1] If the objection is not continually noted, the error in the admission of evidence will be cured when the same evidence is admitted elsewhere without objection. *Valle v. State*, 109 S.W.3d 500, 509–10 (Tex.Crim. App.2003); *Ethington*, 819 S.W.2d at 858 (citing *Hudson v. State*, 675 S.W.2d 507, 511 (Tex.Crim.App.1984)). The error, therefore, would be rendered harmless.

---

1. There are two exceptions to the continual-objection requirement: (1) obtain a running objection for each witness through whom the evidence is offered, or (2) request a hearing outside the jury's presence. *Martinez*, 98 S.W.3d at 193.

*Dickson v. State*, 246 S.W.3d 733, 744 (Tex. App.-Houston [14th Dist.] 2007, pet. ref'd).

During Nickerson's trial, evidence of who owned the stolen phone came in elsewhere during the trial. Sergeant Newcomb testified that the phone was important to the investigation, the phone was taken from one of the complainants, and the phone was tracked to the Redbud location—Nickerson's home. Nickerson never objected to Sergeant Newcomb's testimony. Furthermore, Duran stated at trial that his phone was stolen, and police officers asked his permission to track his phone. Duran also identified the phone in State's exhibit 101 as his. Again, Nickerson never objected to Duran's testimony about his phone. Any error that could have occurred based on the complained—of testimony was cured when the same evidence was admitted elsewhere without objection. Accordingly, we overrule Nickerson's fourth issue.

V

**Prosecutorial Misconduct?**

In issues five, six, seven, and eight, Nickerson contends that the prosecutor committed prosecutorial misconduct when he made statements that were outside the record during closing arguments. Additionally, in his ninth issue, he complains that the trial court erred by denying his motions for mistrial after the prosecutor's comments because the cumulative effect of the comments denied him a fair trial and his right to due process. The State argues that the comments did not prejudice Nickerson, and the trial court cured any error with instructions to disregard the comments. The State also contends that Nickerson has not presented evidence that the jury failed to follow the trial court's instructions.

A jury argument is permissible or proper if it fits into one or more of the following four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement. *McFarland v. State*, 989 S.W.2d 749, 751 (Tex.Crim.App.1999); *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim.App.1992). When the State has departed from one of these categories during closing argument, and has engaged in conduct calculated to deny the accused a fair and impartial trial, we should reverse. *Wilson v. State*, 938 S.W.2d 57, 59 (Tex. Crim.App.1996), *abrogated on other grounds by Motilla v. State*, 78 S.W.3d 352 (Tex.Crim.App.2002). During the guilt/innocence phase of the trial, the prosecutor made the following statements during closing arguments:

Prosecutor: What is ironic in this case is the person that could probably most reach Alan Nickerson . . . is Carltrell Odom. He knew their desires. He knew their struggles, their hardships, what they wanted in life. And how—

Defense: Judge, I object to that. That's outside the record. There's no evidence of that whatsoever.

Court: Sustained.

Defense: I'd ask the jury be instructed to disregard the last comment.

Court: Jury will be instructed to disregard.

Defense: I move for a mistrial.

Court: That will be denied.

Prosecutor: Don't you know he knew exactly how he could reach those kids.

Defense: Judge, again, in light of the Judge's ruling, she persists.

Court: Sustained.

Defense: I again object. Ask the jury to be instructed to disregard.

Court: Please disregard.

Defense: Judge, I move for a mistrial.

Court: Denied.

Prosecutor: He worked hard and you can tell he worked hard. And if you look at him in the uniform and you think about how it is that he got ready for work and what all he had to do, to iron his uniform, polish up his badge—

Defense: Judge, again she must have heard a different trial. I object. That is outside the record.

Court: Sustained. Let's move on, Ms. Barnett.

Defense: Again, Judge, I ask the jury be instructed to disregard her last comment.

Court: Jury will be instructed to disregard.

Defense: Move for a mistrial.

Court: Denied. Let's move along, Ms. Barnett.

. . .

Prosecutor: When Ms. Lewis' sons grow up, Carl and Kyran, and they have families of their own and children, they will see the pictures of Carltrell around the house. And you know they're going to ask questions. Who's this, Daddy?

Defense: Judge, again, I'm going to object. This is improper argument and it is outside the record. It is not proper summation. It is not within the bounds of proper jury argument.

Court: Sustained.

Defense: Again, Judge, I ask the jury be instructed to disregard the prosecutor's last comment.

Court: Jury will be instructed to disregard.

Defense: Judge, I move for a mistrial.

Court: Denied.

 We review a trial court's ruling on a motion for mistrial using an abuse-of-discretion standard. *Webb v. State,* 232 S.W.3d 109, 112 (Tex.Crim.App.2007); *Hawkins v. State,* 135 S.W.3d 72, 76–77 (Tex.Crim.App.2004). We uphold a trial court's decision if it was within the zone of reasonable disagreement. *Archie v. State,* 221 S.W.3d 695, 699 (Tex.Crim.App.2007) (citing *Wead v. State,* 129 S.W.3d 126, 129 (Tex.Crim.App.2004)). If the prejudice is not curable, then a mistrial is required. *Archie,* 221 S.W.3d at 699. But, an improper jury argument may be cured if the trial court gives the jury an instruction to disregard the prejudicial statements. *See Newby v. State,* 252 S.W.3d 431, 438 (Tex.App.-Houston [14th Dist.] 2008, pet. ref'd). "The question of whether a mistrial should have been granted when a curative instruction has been given involves most, if not all, of the same considerations that attend a harm analysis." *Id.* (citing *Hawkins,* 135 S.W.3d at 77). The Court of Criminal Appeals has explained that if constitutional issues are not involved in a case, then courts should use a three-part analysis to evaluate whether the trial court abused its discretion in denying a motion for mistrial based on an improper jury argument. *See Hawkins,* 135 S.W.3d at 77; *Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App.1998). The three-part analysis includes: (1) the severity of the misconduct; (2) measures adopted to cure the misconduct; and (3) certainty of conviction absent the misconduct. *Hawkins,* 135 S.W.3d at 77; *Mosley,* 983 S.W.2d at 260; *Newby,* 252 S.W.3d at 438.

In reviewing the prosecutor's statements, we must consider the magnitude of the prejudicial effect of the statement. *See Washington v. State,* 16 S.W.3d 70, 74 (Tex.App.-Houston [1st Dist.] 2000, no pet.). During closing arguments, the State tried to humanize the complainant with extraneous information. Although the prosecutor's comments were inappropriate and outside the record, the degree of misconduct was relatively minor and therefore

favors a finding of harmless error. Second, the record reflects that after the prosecutor's statements, Nickerson asked the trial court for a jury instruction to disregard the statements. The trial court complied, and promptly instructed the jury to disregard each statement. Additionally, Nickerson has not produced any evidence the jury failed to follow the court's instructions. In the absence of any evidence to the contrary, we presume the jury followed the court's instructions. *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex.Crim.App. 1999). Finally, we conclude that Nickerson's conviction was fairly certain, regardless of the prosecutor's inappropriate comments, because he was found in possession of one of the robbery victim's stolen cell phones and the jacket worn by the shooter, and he confessed to shooting the complainant during the course of the robbery. Accordingly, we hold the trial court did not abuse its discretion in denying Nickerson's motions for mistrial, and we overrule his fifth, sixth, seventh, eighth, and ninth issues on appeal.

\* \* \*

For the foregoing reasons, we affirm the trial court's judgment.