**Affirmed and Memorandum Opinion filed April 18, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00296-CR

---

**THE STATE OF TEXAS, Appellant**

**V.**

**ANTONIO JEFFERSON, Appellee**

---

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1293275**

---

## MEMORANDUM OPINION

The trial court granted appellee Antonio Jefferson's motion to suppress statements he made to police without having received the warnings mandated by *Miranda v. Arizona*, 384 U.S. 436 (1966), and the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2005). The State appeals, and we affirm.

## BACKGROUND

The appellee was indicted for murder. He filed a pretrial motion to suppress certain incriminating statements. The State called two witnesses at the suppression hearing, Sergeant Wayne Kuhlman and Deputy James Cassidy, both of the Harris County Sheriff's Office. The appellee and his girlfriend, Krunslete Posey, testified for the defense.

After making oral findings of fact and conclusions of law on the record, the trial court made supplemental findings of fact and conclusions of law in writing. Those provided:

> (1) that the Court did not find the Defendant or [Posey] to be credible witnesses at the suppression hearing to the extent that their testimony conflicted with Cassidy & Kuhlman; (2) that the Court found the police officers who testified at the suppression hearing, specifically James Cassidy and Wayne Kuhlman, to be credible witnesses; (3) that even under the facts presented by the officers, a reasonable innocent person in the Defendant's position would believe that he was in custody; and[] (4) that the Defendant was in custody at the time that he spoke to police.

The following is a summary of the testimony given by Cassidy and Kuhlman.

Cassidy and Kuhlman were part of a four-person squad assigned to investigate a homicide that occurred at 13150 Bissonnet, in Harris County on January 24, 2011. They arrived at the scene of the crime at about 8 p.m. the day the homicide occurred to begin their investigation. After interviewing several possible witnesses, Cassidy and Kuhlman obtained a license plate number they believed belonged to the person who had committed the homicide. They tracked the number to a Cadillac registered at 5919 Irish Hill Drive and discussed their investigation at a nearby gas station with Sergeant Ronald Hunter and Deputy

2

Lance Fisher, the other two members of their squad. Each officer was in plainclothes.

Cassidy, Kuhlman, Hunter, and Fisher took four unmarked cars to the Irish Hill address. They were unable to find the Cadillac, but the registered owner of the Cadillac allowed them to search his house. While Hunter and Fisher were still inside, a car drove by the Irish Hill address that Cassidy and Kuhlman recognized as the Cadillac for which they were searching. Cassidy and Kuhlman followed the Cadillac for "a couple blocks" in Kuhlman's unmarked car before pulling it over in the middle of an intersection. Because Kuhlman's car was unmarked and was not equipped with a siren, emergency lights, or a public address system, the officers pulled the Cadillac over by flashing Kuhlman's 20,000-candle flashlight at the driver and motioning for him to pull over. The appellee was driving the Cadillac, and Posey was riding in the passenger seat.

Cassidy and Kuhlman drew their weapons and approached the Cadillac from the rear. Kuhlman was on the driver's side and told the appellee to stick his hands out of the window and step out of the vehicle. Kuhlman ordered the appellee to the back of the unmarked vehicle; he then holstered his weapon and frisked and handcuffed the appellee. Kuhlman orally identified himself as a police officer and told the appellee that he had been stopped because the Cadillac he was driving had been involved in a homicide. Kuhlman also told the appellee he was being handcuffed for safety reasons and was not under arrest.

Around the same time, Hunter and Fisher arrived in two unmarked cars. An officer from the Houston Police Department arrived shortly thereafter in a marked HPD patrol car. Kuhlman placed the appellee in the back of the HPD patrol car and told him, "Look, you're not under arrest or anything. We're going to sit you

3

down here while we work this out." The appellee was still handcuffed. Kuhlman closed the door on the HPD patrol car and talked with Cassidy, Hunter and Fisher. With the appellee in the back of the HPD patrol car, Kuhlman took Cassidy back to the Irish Hill address to retrieve Cassidy's car.

Kuhlman returned about five minutes later and told the appellee, "Hey, I want to take you down to my office so we can talk about everything." The appellee agreed to go with Kuhlman, and Kuhlman moved the appellee from the HPD patrol car to Kuhlman's unmarked car. Kuhlman then drove the appellee from the location of the traffic stop in Fort Bend County[1] to a secure sheriff's office facility located at 601 Lockwood in downtown Houston; the appellee remained handcuffed for the entirety of the 30-minute drive.

They arrived at 601 Lockwood at around 3:20 a.m. on January 25, 2011. Kuhlman brought the appellee into the building through a side door that only law enforcement officers could access. Kuhlman brought the appellee up a flight of stairs and through an area of detective workstations to a small, windowless interview room. Only after placing the appellee in the interview room did Kuhlman remove his handcuffs. The appellee was never allowed to contact any friends or family members.[2]

After arriving in the interview room, the appellee told Kuhlman he needed to use the restroom. Cassidy escorted him down the hall to the restroom and waited

---

[1] Cassidy and Kuhlman testified that they were unaware they had crossed into Fort Bend County when they stopped the appellee. The location of the stop does not affect our disposition of this appeal.

[2] During the suppression hearing, Kuhlman testified that he had a "vague recollection" of refusing at least two of the appellee's requests to speak with family members in the interview room. Cassidy denied hearing the appellee make such requests, but he admitted to leaving the interview room at least once while Kuhlman and the appellee were inside.

by the door while the appellee used the restroom. Cassidy escorted the appellee back to the interview room and then left him alone. A crime scene investigator arrived around this time and asked for the appellee's consent to test his hands and clothes for gunshot residue and take a DNA sample. The appellee consented at 3:50 a.m. Cassidy and Kuhlman entered the room to interview the appellee soon after the investigator completed his tests.

The appellee's interview began at 4:05 a.m. and ended at 5:29 a.m. on January 25, 2011; the record contains a full interview transcript. In relevant part, the transcript provides:

Kuhlman: Look, okay, people can understand some things, but if you wanna come off all cold and hard, you can do that. But, I want you to think about something. Is that how you really wanna be seen? Because, you know, there's, there's some extenuating circumstances here. You and I both know it.

&ast; &ast; &ast;

Cassidy: We don't think you're just a col . . . some cold blooded killer just goes around getting . . . getting himself, in, in getting in trouble even for no reason. We know that something happened.

&ast; &ast; &ast;

Cassidy: . . . . Where's the gun, Antonio?

&ast; &ast; &ast;

Cassidy: I can't I can't explain this to you, now. I know you . . . if you've been to [Texas Department of Corrections], I guarantee it ain't been for a murder.

&ast; &ast; &ast;

5

Kuhlman:    When you shot 'im, Antonio, was he . . . were y'all right
            there at the gate where they tried to get your girlfriend?
            Did you git 'im in the same spot or where?  Huh?

[The appellee]:    Thank at the same place (inaudible)

Kuhlman:    Do what?  You think at the same place?

Cassidy:    He said the gate.

[The appellee]:    The same place they tried to rape my . . .

Kuhlman:    So then what'd you tell 'im?  You just shot 'im?  Did he
            see the gun?

[The appellee]:    I don't know what he saw.

Cassidy:    Did he have a gun?

[The appellee]:    I don't know.

Kuhlman:    You just start shooting?  Where . . . tell me this.  Where,
            where were you aiming at?  Where was you aiming?

[The appellee]:    (Sighs deeply again) Honestly, I was aiming at his
            ass[;] he ducked or something.  (whispering)

Following the interview, Cassidy and Kuhlman contacted the District Attorney's
Office, and charges were filed against the appellee.

## ANALYSIS

When reviewing a trial court's findings of fact and conclusions of law
regarding a motion to suppress evidence, an appellate court must give almost total
deference to the trial court's assessment of historical facts.  *State v. Ortiz*, 382
S.W.3d 367, 372 (Tex. Crim. App. 2012).  The same deference is afforded to the

trial court's conclusions with respect to mixed questions of law and fact that turn on credibility or demeanor. *Id.* When the posture of a case does not present issues of pure fact, or of mixed questions of law and fact that turn on credibility or demeanor, and presents only questions of the validity of the trial court's "legal rulings," an appellate court's review is *de novo*. *Id.*

## I. Custody Determination

*Miranda* and Article 38.22 require warnings when a person is subject to "custodial interrogation." Tex. Code Crim. Proc. Ann. art. 38.22 § 2; *Miranda*, 384 U.S. at 444. "Custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. A person is "in custody" if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).

Generally, a routine traffic stop does not place a person in custody for *Miranda* purposes. *Ortiz*, 382 S.W.3d at 372. But a traffic stop may escalate from a non-custodial detention into a custodial detention when formal arrest ensues or a detainee's freedom of movement is curtailed to the degree associated with a formal arrest. *Id.* We evaluate whether a person has been detained to the degree associated with formal arrest on an *ad-hoc*, or case-by-case basis. *Id.* The primary inquiry focuses on whether a reasonable person would perceive the detention to be a restraint on his movement comparable to formal arrest. *Id.*

In evaluating whether a reasonable person would believe his freedom has been restrained to the degree of formal arrest, a reviewing court looks only to the

objective factors surrounding the detention. *Id.* The subjective beliefs of the detaining officer are not included in the calculation of whether a suspect is in custody. *Id.* at 372-73. But if the officer manifests his belief to the detainee that he is a suspect, then that officer's subjective belief becomes relevant to the determination of whether a reasonable person in the detainee's position would believe he is in custody. *Id.* 373. Conversely, any undisclosed subjective belief of the suspect that he is guilty of an offense should not be taken into consideration because the reasonable person standard presupposes an innocent person. *Id.*

In its oral ruling, the trial court reasoned that the totality of the circumstances demonstrated that the appellee was in custody. On that basis, the court distinguished the cases relied on by the State:

> The court recognizes that handcuffing, even for transport, has been repeatedly excused by the Court of Appeals . . . . I think when we review the totality of the circumstances objectively, what the Court comes down to is this was, unlike [*Dowthitt*][3], where a guy comes walking into a police station not once but twice, or even [*Turner*][4], where [law enforcement officers are] at least at the person's house where you have some sense of familiarity . . . this was a nonconsensual beginning to this interaction. . . [Cassidy and Kuhlman] flagged [the appellee] down with their flashlight from their unmarked cars, and, again, the guns were in their safety drawn but you still have two officers with guns drawn. He's asked to get out of the car. He's pretty much handcuffed from the get-go. He has to be put in the car.

> \*          \*          \*

> [The appellee] has to be buckled in. He's then driven through the night, 28 miles to [601 Lockwood], a building that's not then open to

---

[3] 931 S.W.2d at 252.

[4] *Turner v. State*, 252 S.W.3d 571, 577 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd).

the public. This is the middle of the night, goes upstairs . . . . He was taken to the bathroom and back. And again, they have a reason for doing that, but it's a factor to be considered.

[The appellee is] never, unlike in some of those other cases, he's not allowed to go back out into the lobby and talk to his family. He doesn't go out to his car. He had no vehicle. He was 28 miles from where he left his vehicle.

\*                              \*                              \*

[U]nlike most of the other cases, [the appellee] was not Mirandized at any time, even when it appeared that [Cassidy and Kuhlman] were going to get the admission that they were seeking.

\*                              \*                              \*

The Court finds that the totality of the circumstances seem[s] to suggest that he was in custody, he was not Mirandized, so the statement should be suppressed.

It is well-settled that a court making a custody determination must consider the "totality of the circumstances." *See, e.g.*, *Dowthitt*, 931 S.W.2d at 255 ("[C]ustody is established if the manifestation of probable cause, **combined with other circumstances**, would lead a reasonable person to believe that he is under restraint to the degree associated with arrest.") (emphasis added); *Campbell v. State*, 325 S.W.3d 223, 232 (Tex. App.—Fort Worth 2010, no pet.); *State v. Vasquez*, 305 S.W.3d 289, 294 (Tex. App.—Corpus Christi 2009, pet. ref'd); *Turner*, 252 S.W.3d 571, 580 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); *Bartlett v. State*, 249 S.W.3d 658, 668 (Tex. App.—Austin 2008, pet. ref'd); *Xu v. State*, 191 S.W.3d 210, 217 (Tex. App.—San Antonio 2005, no pet.). We conclude that a reasonable person in the appellee's position would have believed he was in custody when Cassidy and Kuhlman began interviewing him.

## II.    Objective Facts

The objective facts show that, by the time the appellee's interview began, (1) Kuhlman had ordered the appellee out of his car at gunpoint; (2) the appellee had been patted down, handcuffed, and placed in a patrol car; (3) while in the patrol car, the appellee was told that he was not under arrest; (4) five law enforcement officers in four vehicles had been present at the scene of the original stop; (5) over the course of about 30 minutes, Kuhlman had transported the appellee to a secure facility in the middle of the night; (6) the appellee had been in handcuffs from the time of the original stop until he arrived in the interview room sometime after 3 a.m.; and (7) Cassidy escorted the appellee to the restroom and waited by the door until the appellee was finished.

We turn to the cases examining similar circumstances.

### A.    Stationhouse Questioning

Citing *Nickerson v. State*, 312 S.W.3d 250 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd), the State argues that, "[S]tationhouse questioning in and of itself does not constitute custody; if police officers request that a person speak with them and the person is acting on this request without force, threat, or coercion, then the act is voluntary and the person is not in custody." This court concluded in *Nickerson* that the accused was never deprived of his freedom in any significant way or restricted in his movement to the degree associated with a formal arrest. *Id.* at 257. That conclusion rested on police testimony that the accused voluntarily agreed to go with police officers who arrived at his home, and that the officers never drew their weapons or handcuffed the accused. *See id.* In contrast, it is undisputed here that Kuhlman ordered the appellee out of his car at gunpoint and then handcuffed him until arriving in the interview room.

10

## B.    Handcuffing

The State also argues that "placing a person in handcuffs does not automatically mean that the person is in custody." *See Balentine v. State*, 71 S.W.3d 763 (Tex. Crim. App. 2002); *Turner*, 252 S.W.3d 571.  The accused in *Balentine* was handcuffed as part of an investigative detention that "did not exceed the scope of a *Terry* "stop and frisk." *Balentine*, 71 S.W.3d at 771; *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968).  The State does not and cannot argue that the appellee's detention was limited to a *Terry* stop and frisk.

*Turner* involved an appellant who was handcuffed for a 30-mile drive from his house to the facility at 601 Lockwood; like the appellee here, he was told that he was being handcuffed for purposes of officer safety and that he was not under arrest.  *Turner*, 252 S.W.3d at 578.  In *Turner*, this court concluded that "handcuffing appellant based on customary safety concerns, and only for the duration of transport in a car lacking a safety cage, does not show custodial status." *Id.* at 580.

But the State's reliance on *Turner* is misplaced.  There, police seeking to question the appellant arrived at the appellant's house at 11 a.m.  *Id.* at 577.  The appellant was on his front porch at the time, but came to meet the officers in his front yard.  *Id.*  The officers explained that they were investigating an assault that had occurred two days earlier, and the appellant responded "[y]eah, I know why you're here" before agreeing to accompany the officers downtown.  *Id.* at 578.  The officers told the appellant he was not under arrest but he would be handcuffed for safety reasons throughout the drive to the police station.  *Id.*  The officers also told the appellant's sister, who was present, that the appellant was not under arrest, and they told her she was welcome to join them at the police station.  *Id.*  The

11

officers removed the appellant's handcuffs "as soon as the appellant got out of the police car" at 601 Lockwood. *Id.*

Each of these facts distinguishes *Turner* from the case at hand, and each of these facts was explicitly noted in *Turner* to distinguish the Supreme Court's decision in *Kaupp v. Texas*, 538 U.S. 626 (2003). *Id.* at 582. Moreover, in *Turner*, we said, "The critical distinction between *Kaupp* and the case sub judice is the consensual and nonthreatening nature of the events beginning with appellant's stroll from the porch to greet the officers." *Id.* at 582. The circumstances in this case are closer to those in *Kaupp* than they are to those in *Turner*.

Kaupp's brother confessed to killing a fourteen-year-old girl and implicated Kaupp in the crime. *See Kaupp*, 538 U.S. 626, 627-28 (2003). The detectives on the case immediately tried to obtain a warrant to question Kaupp but failed; they then decided to "get [Kaupp] in and confront him with what [his brother] had said." *Id.* at 628. At approximately 3 a.m., six law enforcement officers — three plainclothes detectives and three uniformed officers — arrived at Kaupp's house and knocked on the front door. *Id.* Kaupp's father allowed the officers to enter the house. *Id.* Detective Gregory Pinkins, accompanied by another plainclothes detective and two uniformed officers, went to Kaupp's bedroom, awakened him with a flashlight, identified himself, and said, "we need to go and talk." *Id.* Kaupp's only response was "okay." *Id.*; *Kaupp v. State*, No. 14-00-00128-CR, 2001 WL 619119, at *1 (Tex. App.—Houston [14th Dist.] June 7, 2001, pet. ref'd), *vacated sub nom.*, *Kaupp v. Texas*, 538 U.S. 626 (2003). Kaupp was handcuffed and escorted out of his house and into a patrol car. *Kaupp*, 538 U.S. at 628. He was not wearing shoes and was dressed only in boxer shorts and a T-shirt. *Id.* With Kaupp in the patrol car, the officers drove to the scene where the complainant's body had been discovered; they stopped there for five to 10 minutes

12

before taking Kaupp to the sheriff's headquarters. *Id.* When they arrived at the sheriff's headquarters, the officers escorted Kaupp to an interview room, removed his handcuffs, and advised him of his *Miranda* rights. *Id.* Kaupp eventually confessed his involvement in killing the complainant. *Id.* at 628-629.

In concluding that Kaupp "was arrested within the meaning of the Fourth Amendment" when he confessed, the Supreme Court cited to a test derived from Justice Stewart's opinion in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), which gave examples of circumstances that might indicate a seizure. *Id.* at 629-31. Those circumstances include "'the threatening presence of several officers, the display of weapons by an officer, some physical touching of the person or the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* at 630 (quoting *Mendenhall*, 446 U.S. at 554). The Court found evidence of every one of those probative circumstances. *Id.* at 630-31.

The facts in *Kaupp* are comparable to the facts before us now: (1) the critical events took place late at night; (2) plainclothes officers initiated contact with the appellee; (4) the appellee was not given an option of non-compliance;[5] (5) the appellee was handcuffed and placed in an HPD patrol car; (6); the appellee sat in the HPD patrol car for at least five minutes before Kuhlman moved him to his own car and drove him to 601 Lockwood; and (7) the appellee remained handcuffed until he arrived in an interview room.

This case also presents evidence of each of the probative circumstances mentioned by Justice Stewart in *Mendenhall*. *See* 446 U.S. at 554. Two officers

---

[5] The State does not argue that the appellee could have declined to exit his car when Cassidy and Kuhlman pulled him over.

13

ordered the appellee out of his car at gunpoint, and three more officers arrived while he was being handcuffed and placed in the back of a patrol car.

## C. Subsequent Arrest

The State further argues that "an arrest at the end of an otherwise non-custodial interview does not magically convert the entire previous non-custodial interview into a custodial one." The cases it relies on for this contention are distinguishable. *See Bailey v. State*, No. 05-08-01590-CR, 2009 WL 4725348 (Tex. App.—Dallas Dec. 11, 2009, pet. ref'd) (not designated for publication); *see also State v. Rodriguez*, 986 S.W.2d 326 (Tex. App.—El Paso 1999, pet. ref'd).

In *Bailey*, police had a warrant to arrest the appellant when they arrived at the appellant's house late at night to question him. *Bailey*, 2009 WL 4725348, at *4. Before police told the appellant that they had the warrant, the appellant invited them in and voluntarily answered their questions. *Id.* After six minutes and 39 seconds, the police manifested their probable cause to arrest the appellant and transformed the non-custodial interview into a custodial interview. *Id.* The court rejected the appellant's contention that he had been in custody for the initial six minutes and 39 seconds. *Id.* The time period at issue in *Bailey* is much shorter than the time period at issue here, and the appellant in *Bailey* was never handcuffed. *See id.* Further, in *Bailey*, the appellant's wife was present for the entire interview; the appellee here did not see his girlfriend, Posey, after the initial stop. Perhaps most importantly, the appellant in *Bailey* invited police into his apartment to talk; the appellee here was ordered out of his car at gunpoint.

In *Rodriguez*, a suspect voluntarily came to a police station and waited in the lobby; a detective who was new to the case met the suspect in the lobby and asked the suspect to come into his office. *Rodriguez*, 986 S.W.2d at 328. The suspect

14

was not handcuffed, and the detective did not display his weapon. *Id.* The suspect gave a statement that the detective typed into a computer. *Id.* The entire statement took place in the detective's office over several hours because, as the detective explained "it was a long statement and I'm also a slow typist." *Id.* The suspect confessed to committing a crime in his statement, and he was arrested immediately after giving this statement. *Id.* The court in *Rodriguez* rejected the argument that the suspect had been in custody during the interview and determined that custody began only when the suspect was placed under arrest. *Id.* at 330.

Unlike the suspect in *Rodriguez*, the appellee here did not arrive at the 601 Lockwood of his own accord; he was transported there by a law enforcement officer. Kuhlman displayed his weapon during the initial stop and handcuffed the appellee for the duration of the initial stop, the drive to 601 Lockwood, and the journey to the interview room.

## III. Totality of the Circumstances

The State also relies on *Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App. 2010). In *Estrada*, a detective arrived at the appellant's apartment around 8 p.m. to question him about murders that had occurred earlier that day. *Id.* at 289. The appellant's mother and sister were present in the apartment. *Id.* When the detectives left the apartment, the appellant followed them out of the apartment alone and told them he wanted to give a statement. *Id.* The detectives informed the appellant that he did not have to give a statement and that he was not under arrest. *Id.* Saying he had nothing to hide, the appellant decided to ride with the detectives to the police station; during the ride, he took a call on his cell phone. *Id.* After arriving at the police station, the detectives took the appellant to an interview

room and promptly informed him of his *Miranda* rights.[6]  *Id.* at 289-90.  The appellant gave a statement that included a confession; after the appellant confessed, police escorted him to and from the restroom.  *Id.* at 293 n.20.

The appellee here was not approached in his apartment and did not instigate the trip to the facility at 601 Lockwood.  Instead, he was ordered out of his car at gunpoint in the middle of an intersection.  He was handcuffed for the entirety of the ride to the police station.  The appellee was never given his *Miranda* warnings, and he was escorted to and from the restroom before he had given any statement.  Further, the appellant in *Estrada* was outside of his apartment when he was told he was not under arrest; the appellee here was told he was not under arrest while he was handcuffed and seated in the back of the HPD patrol car.  Immediately after placing the appellee in the patrol car, Kuhlman told him, "Look, you're not under arrest or anything.  We're going to sit you down here while we work this out."  Just before moving the appellee from the HPD patrol car to his own unmarked car, Kuhlman reiterated, "Look, you're not under arrest and you don't have to do this."[7]

We conclude that, taken together, all of the objective circumstances present in this case would combine to lead a reasonable person to believe that his liberty was compromised to the degree associated with formal arrest at the time Cassidy and Kuhlman began the interview.  *See Ortiz*, 382 S.W.3d at 373.  Accordingly, Fifth Amendment protections were triggered, and the appellee was entitled to statutory and *Miranda* warnings.  *See id.*  We hold that the appellee's statements were properly suppressed.

---

[6] With the exception of *Balentine*, every published case cited by the State involves an accused who actually received *Miranda* warnings.  *See Nickerson*, 312 S.W.3d at 254-55; *Turner*, 252 S.W.3d at 579; *Rodriguez*, 986 S.W.2d at 328.

[7] The record does not clearly indicate whether this second statement came before or after the appellee agreed to accompany Kuhlman to the facility at 601 Lockwood.

16

## IV. Other Grounds for Determining Custody

At the end of its brief, without citing authority, the State argues that "[a]t a minimum, all of the appellee's statements prior to his admission of 'aiming at his ass' were non-custodial and should be admitted into evidence."

We interpret this to be an argument that the appellee's admission that he was "aiming at his ass" established probable cause to arrest, which in turn transformed the non-custodial interview into a custodial interview. Under certain circumstances, the existence of probable cause can constitute custody. *See Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009); *Dowthitt*, 931 S.W.2d at 255. Such circumstances make up the fourth of four general situations that may constitute custody for purposes of *Miranda* and the Texas Constitution:

> (1) The suspect is physically deprived of his freedom of action in any significant way;
>
> (2) A law enforcement officer tells the suspect he is not free to leave;
>
> (3) Law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and;
>
> (4) There is probable cause to arrest the suspect and law enforcement officers do not tell the suspect he is free to leave.

*Gardner*, 306 S.W.3d at 294.

Elsewhere in its brief, the State addresses the first and second of these situations:

> The appellee was not physically deprived of his freedom of action in any significant way because he was repeatedly told that he could leave, and he could have left up until the time that he was arrested

17

after giving his confession.  Likewise, it was not until that point that any law enforcement officer told the appellee that he could not leave.

Our holding today is based on the third general situation; we conclude that the appellee was in custody because a reasonable person in his situation would feel that his freedom of movement was restrained to the degree associated with a formal arrest.  *See Dowthitt*, 931 S.W.2d at 254.  We do not address the applicability of other grounds.

## CONCLUSION

We overrule the State's sole issue on appeal and affirm the judgment of the trial court.


/s/     William J. Boyce
Justice


Panel consists of Justices Boyce and McCally and Senior Justice Mirabal.[8]
Do Not Publish — Tex. R. App. P. 47.2(b).

---

[8] Senior Justice Margaret Garner Mirabal sitting by assignment.