**Affirmed and Memorandum Opinion filed October 1, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00815-CR

---

### THOMAS BRADLEY HAYNES, Appellant,

### V.

### THE STATE OF TEXAS, Appellee.

---

### On Appeal from the 182nd District Court
### Harris County
### Trial Court Cause No. 1351660

---

## M E M O R A N D U M   O P I N I O N

Appellant Thomas Bradley Haynes appeals his conviction for aggravated sexual assault of an elderly person, arguing the inadmissibility of both the complainant's in-court identification of Haynes and the DNA analysis. We affirm.

# I

On the early morning of June 13, 2011, the complainant, a seventy-two-year-old woman, was at home alone. She woke up early to the sound of her dog barking and got up to check things around the house. When she did not see anything, she lay down on the couch. Then, according to the complainant, a naked man she later identified as Haynes jumped up from behind the couch, physically overpowered her, forced her to her bedroom, and raped her. The complainant said she was sexually assaulted vaginally and anally during the attack, which lasted "a couple hours." After the police arrived, the complainant went to Memorial Hermann Hospital, where a nurse performed an exam and prepared a sexual-assault kit. Charges were filed against Haynes when DNA found in the sexual-assault kit identified him in a database. Haynes entered a plea of not guilty.

At trial, the complainant identified Haynes as her assailant in front of the jury after the trial court overruled a motion to suppress the identification. The complainant testified that her in-court identification was based on the approximately two hours she spent with her assailant because there was sufficient light during the attack and she could see his face. Additionally, she previously saw her attacker about a week before the assault when she found him hiding in her closet.[1] The complainant described her assailant to police and a composite drawing was prepared based on the complainant's description. There is no indication in the record that the complainant changed her description during investigation or trial.[2]

---

[1] The complainant testified she saw her attacker about a week before the assault when she discovered him hiding in her bedroom closet. When the complainant screamed, the intruder went out the window. The complainant testified she did not call the police at that time because she assumed she did not have enough proof to show anyone had been there. She also testified she did not tell her family about finding a man in her closet because she thought they would make her move in with one of them.

[2] The complainant did testify that Haynes looked a little different at trial because he had

Before trial, the complainant identified Haynes from a photo lineup as the man who attacked her. During the investigation, Houston Police Department Detective Keith McMurtry showed the complainant a photo array containing Haynes. After looking at the photos, the complainant chose Haynes's photo and told Detective McMurtry "that's probably him." The complainant testified she meant "he looked more like [her attacker] than anyone on that piece of paper," and she was "90 to 95 percent sure" it was him. After the complainant selected Haynes's photo, Detective McMurtry told her Haynes had been charged with the crime because his DNA matched the DNA recovered from the swabs in the sexual-assault kit.

At trial, several witnesses testified about the process used to determine that DNA evidence linked Haynes to the attack.

First, Floyd Hand, a forensic nurse, testified he examined the complainant and prepared the kit at the hospital. The sexual-assault kit and its contents were labeled as State's Exhibits 21−29, and they were admitted into evidence during Hand's testimony after Haynes's counsel affirmatively stated he had "no objection." Hand testified he followed his usual practice of sealing the samples in the box and labeling the box with identifying information. Hand then signed the sealed box into an evidence locker at the hospital, which is accessible only by forensic nurses. Looking to the evidence log, Hand testified Sandra Martin, a person employed by Forensic Nursing Services, turned the box over to a Houston Police Department officer, who signed for the box. The State did not call Martin or the transporting officer to testify at trial, even though the State filed a subpoena list that included additional witnesses.

---

longer hair and was not as thin, but she testified that "other than that" Haynes was the same man who attacked her.

Later in the trial, Juli Rehfuss, with the Houston Police Department Crime Lab, testified she processed the sexual-assault kit to prepare it for DNA analysis. According to Rehfuss, when she first gets a kit, she inspects it to make sure it is properly sealed and to make sure the information on the label corresponds to the case file. Rehfuss testified she followed her usual practice in this case; she determined the sexual-assault kit was sealed and there was no evidence of tampering. Rehfuss broke the seal to process the contents.

After processing, Clay Davis, also with the Houston Police Department Crime Lab, performed DNA analysis on these items. Davis compared Haynes's DNA sample to the DNA found in the kit. By doing the comparison, Davis determined: 1) Haynes was a possible contributor to the DNA mixture found in the vaginal swab, and 2) "to a reasonable degree of scientific certainty," Haynes was the source of the DNA found on the anal swab.

The jury found Haynes guilty of aggravated sexual assault of an elderly person, enhanced with one prior felony conviction, and assessed his punishment at 75 years in the penitentiary.

## II

On appeal, Haynes argues the trial court abused its discretion in admitting: (1) the complainant's in-court identification because it had been tainted by the suggestive pre-trial procedure, and (2) DNA evidence linking Haynes to the attack because the State did not show the proper predicate.

We review the trial court's admission of evidence using an abuse-of-discretion standard. *See Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005); *Nickerson v. State*, 312 S.W.3d 250, 255 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Although a trial court has substantial discretion, it can abuse its

4

discretion if its rulings are outside of "that zone within which reasonable persons might disagree." *Nickerson*, 312 S.W.3d at 255. A trial court's evidence ruling will be upheld if the record reasonably supports the ruling. *Id*.

## A

Haynes first complains that the trial court should have suppressed the in-court identification. Detective McMurtry, Haynes argues, impermissibly bolstered the identification in the complainant's mind when he told her that the man she selected from a photo lineup had already been charged. In response, the State argues the trial court did not err because the detective's statements during the photo array were not so suggestive as to create a "substantial likelihood of irreparable misidentification" and because the in-court identification was reliable. Because the complainant saw her assailant face-to-face during the attack and could describe him after, the State argues the in-court identification was sufficiently reliable for the trial court to admit it, even if Detective McMurtry's statements were suggestive.

An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification. *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). The test is whether "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id*.

Courts weigh five non-exclusive factors "against the corrupting effect of any suggestive identification procedure" to determine the reliability of an in-court identification from the totality of the circumstances: (1) the opportunity for the witness to view the criminal at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at confrontation; and (5) the length of time between

5

the crime and the confrontation. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008). We consider these factors in the light most favorable to the trial court's ruling, but once the facts are determined, we weigh the reliability against "the corrupting effect" of the suggestive pretrial identification *de novo*. *See Loserth v. State*, 963 S.W.2d 770, 773−74 (Tex. Crim. App. 1998). When examining the factors, the burden is on the defendant to show by clear and convincing evidence the in-court identification is unreliable. *Harris v. State*, 827 S.W.2d 949, 959 (Tex. Crim. App. 1992).

In *Luna*, the court held that although an investigating officer's statement that the complainant had selected "the right guy" from a photo array may have been suggestive, it was not so suggestive to cause irreparable misidentification when there was sufficient evidence the in-court identification was reliable. *Luna*, 268 S.W.3d at 608. In *Luna*, which concerned a carjacking, several factors pointed to the reliability of the in-court identification: (1) the complainant had an opportunity to view the person who carjacked him face-to-face for ten to twenty minutes; (2) he could describe the carjacker to the police; and (3) he seemed "positive" when he chose the defendant from a photo array a week after the crime. *Id*.

Like the officer's statements in *Luna*, Detective McMurtry's comment to the complainant that the man she selected had already been charged may have been suggestive. *See id.* However, considering the reliability factors, the complainant's in-court identification is sufficiently reliable. The complainant could see her assailant face-to-face in sufficient lighting during the attack, which lasted a couple of hours. She also saw him the prior week when she found him in her closet. Because of the nature of the attack, the complainant's attention was focused on her assailant. Additionally, the complainant could describe her attacker to police and for the composite drawing before seeing the photo array. These descriptions did

6

not contradict her identification of Haynes at trial. Weighing these reliability factors against the suggestiveness of McMurtry's comments, there is no substantial risk of irreparable misidentification. *See id.*; *see also Ibarra*, 11 S.W.3d at 195.

Haynes argues that *Luna* is distinguishable because the complainant was "positive" when he made his selection from the photo array, while the complainant in the instant case was only "90 to 95 percent sure." *See Luna*, 268 S.W.3d at 608. Haynes urges this difference makes Detective McMurtry's statements more suggestive than those made by the officer in *Luna*. *See id.* The use of an alternate descriptor in this case, which arguably is no different functionally, does not make McMurtry's comments so suggestive to rise to the level of creating irreparable misidentification. *See Ibarra*, 11 S.W.3d at 195; *see also Luna*, 268 S.W.3d at 605−08. Further, the "level of certainty" demonstrated by the witness is just one factor considered from the totality of circumstances. *See Luna*, 268 S.W.3d at 605.

The trial court did not err in allowing the in-court identification testimony before the jury, and Haynes's first issue on appeal is overruled.

B

In his second issue, Haynes argues testimony showing DNA collected from the complainant for the sexual-assault kit contained Haynes's DNA should have been excluded. According to Haynes, the State did not properly demonstrate the chain of custody of the evidence swabs. In response, the State first argues Haynes did not preserve this issue for appellate review. Alternatively, the State argues the chain of custody was properly shown.

1

The State argues Haynes did not preserve the issue for appeal because he did not make a timely and specific objection to the evidence every time it was

presented at the trial court. *See* Tex. R. App. P. 33.1(a); *see also Hudson v. State*, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984) (holding counsel must object every time allegedly inadmissible evidence is offered at trial to preserve error). More specifically, Haynes did not object during Hand's testimony, which is when the sexual-assault kit was admitted into evidence, and he affirmatively said he had "no objection" when a demonstrative chart summarizing Davis's testimony was admitted into evidence.

In his appellate brief, without specifically addressing the preservation issue or citing any cases, Haynes states his counsel began objecting during Rehfuss's testimony, and continued to object prior to and during Davis's "incriminating" testimony.

Even assuming Haynes preserved the issue for appeal, looking to the merits, the trial court properly overruled the chain-of-custody objection.

2

Haynes argues the trial court erred when it admitted the DNA evidence because the State failed to show it was "treated and maintained with the utmost, well-documented care." More specifically, the transporting officer and the nurse who turned the kit over to the police did not testify at trial.

According to evidence rules, the authentication or identification requirement is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a). To meet this evidentiary requirement, a proponent of scientific testing results, such as the DNA analysis in this case, must establish a chain of custody. *See Smith v. State*, 450 S.W.2d 92, 94 (Tex. Crim. App. 1970). Without evidence of tampering or impropriety, most objections regarding breaks in the chain of custody go to the weight of the

evidence, rather than its admissibility. *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997).

Proof of the beginning and end of the chain of custody is sufficient; a proponent of evidence does not need to show a "moment-by-moment" account of the evidence to support its admission. *Shaw v. State*, 329 S.W.3d 645, 654 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (holding the State established a complete and proper chain of custody of DNA swabs, even when witnesses who handled the evidence during transport did not testify); *See also Caddell v. State*, 123 S.W.3d 722, 727−28 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding testimony by a lab official explaining the evidence was sealed and properly labeled to show it was the substance seized by officers established the chain of custody, even when nobody testified to transporting the evidence to the lab).

In this case, the State established, through testimony explaining the procedures at the hospital and at the crime lab, that the swabs taken from the complainant were the same items tested for DNA: the swabs were labeled and sealed at the hospital, placed in an evidence locker, and then checked for any impropriety upon arrival at the lab. By proving the beginning and end of the chain of custody through the testimony of the nurse and the crime-lab employee, the State established the proper predicate for the DNA evidence. *See Caddell*, 123 S.W.3d at 727−28. Because the crime-lab employees testified that there was no evidence of tampering during transport, the DNA evidence was admissible, and Haynes's second point of error is overruled. *See Lagrone*, 942 S.W.2d at 617.

\* \* \*

In sum, Haynes failed to show the trial court erred by allowing the complainant to identify Haynes in court or by admitting DNA evidence linking

9

Haynes to the attack. We therefore overrule his issues and affirm the judgment of the trial court.

/s/    Jeffrey V. Brown
       Justice

Panel consists of Justices Brown, Christopher, and Donovan.

Do Not Publish — TEX. R. APP. P. 47.2(b).