

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-18-00036-CR

Efrain Leonel **HERNANDEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 406th Judicial District Court, Webb County, Texas
Trial Court No. 2016-CRN-000241-D4
Honorable Oscar J. Hale, Jr., Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:       Luz Elena D. Chapa, Justice
               Beth Watkins, Justice
               Liza A. Rodriguez, Justice

Delivered and Filed: July 31, 2019

AFFIRMED

After a jury trial, Appellant Efrain Leonel Hernandez ("Hernandez") was found guilty of felony murder and sentenced to forty-five years of imprisonment. On appeal, he brings four issues: (1) whether accomplice-witness testimony was corroborated by other evidence; (2) whether the trial court abused its discretion in allowing inadmissible hearsay; (3) whether the trial court's jury charge contained error and Hernandez suffered egregious harm as a result; and (4) whether the trial court abused its discretion in denying his motion for continuance. We affirm.

**FACTS**

On Saturday, November 14, 2015, Christopher Benavides was working as a security guard and parking attendant at Rumors Country Bar ("Rumors") in Laredo, Texas. Because he was feeling sick from a cold, he decided to call his wife to pick him up. At about 10:30 p.m. that night, his father, Hector Benavides Sr. ("Mr. Benavides"), arrived to work the parking lot with Christopher. After 10:30 p.m., Christopher and his father began the process of charging people to park by using cones to reserve parking spots. Christopher testified he and his father had sold a couple of parking spots and needed to make change. As Christopher was leaving to get change, he saw a dark pick-up truck enter the parking lot. A moment later, he heard a man "disrespecting [his] father." Christopher asked his father, "What's this dude's problem?" The man began reversing his pick-up truck while "yapping his mouth." In response, Christopher hit the truck on the driver's side. The man hit his brakes "hard" and opened the door to his truck. The man said, "Don't be hitting my f--king [truck]." The man then reached down to the "side pocket" of the truck's door. Because Christopher thought the man was reaching for a handgun, Christopher moved forward, grabbed the door to the pick-up truck, and "opened it more." Christopher testified he grabbed the man's arm and pulled his arm down to hold him. Christopher saw a woman sitting in the truck and looked around for others. According to Christopher, the man "had tattoos," was wearing "a blue shirt," and "was short." Christopher testified he did not "get a good look at [the man's] face because [Christopher] was in shock looking for a weapon." According to Christopher,

> And then he kept trying to fight, telling me off. At that moment, I threw a punch at him and I punched him. . . . And when I punched him, he–with this hand he moved the truck that way and he threw the truck at me, so when he passed forward like that, I hit the back of his truck and he took off real slow. . . . He went around this way–yes–this way real slow. . . . So, I'm following him, walking behind the truck while he's telling me off and telling me shit . . . . And then when he turns here, I cut through the cars here and he's still telling me shit and I remember–like yeah, we were already heated and he was telling me off . . . and I just told him . . ., "Go ahead and f--k your mother you f--king short . . . midget."

The man stopped, opened his door, and replied, "Follow me asshole. Follow me." Christopher then said, "Just get the f--k out of here. Get out of here."

Christopher called his brother, Hector Benavides Jr., and told him about the incident. According to Christopher, Hector said he would be there shortly. Christopher testified that when his wife arrived to take him home, he was still feeling sick, but did not want to leave his father alone. When his brother arrived, his father told him to go home, reassuring Christopher that his brother was there and the bouncers for Rumors were also nearby at the front entrance. Christopher left. A short while later, he received a phone call from his brother who was screaming that his father had been "jumped" by some men and was severely beaten. Christopher raced back to Rumors and saw the ambulance blocking the entrance. His father later died from his injuries.

The medical examiner testified that most of Mr. Benavides's injuries were "mainly in the head and in the face area." "[T]here were some other injuries in the chest and hands and knees a little bit, but the main area was the head." Mr. Benavides had "raccoon eyes," which was caused by a skull fracture that led to internal bleeding. The top of Mr. Benavides's chest had a "small" "tube-type mark," which the medical examiner concluded was caused by an object. Mr. Benavides suffered from rib fractures, skull fractures, and internal bleeding. The medical examiner concluded that Mr. Benavides died as a result of "multiple blunt force injuries and in the background of preexisting cardiovascular disease or heart disease."

Patrick Mendoza, a delivery driver for a pizza restaurant located in the same shopping plaza as Rumors, testified he saw the attack on Christopher's father. According to Mendoza, Mr. Benavides was alone, sitting on a chair, when he got up to attend a car. After Mr. Benavides finished with the car, Mendoza saw a "group of individuals" walk towards Mr. Benavides. Three men approached Mr. Benavides while two men stayed back. Mendoza testified he felt uneasy because the two men stared at him. According to Mendoza, the other three men surrounded Mr.

Benavides, and one of them yelled at Mr. Benavides, "Where's the other one?" Mendoza then saw one of the men "swing" at Mr. Benavides. Mendoza testified he saw this man clearly and described the man as "kind of short," "bald," and "wearing a blue shirt." However, Mendoza testified he could not see the other two men clearly. The short man continued to hit Mr. Benavides "aggressively." Mr. Benavides tried to get away, but the man standing behind Mr. Benavides grabbed his jacket and pulled him back behind the cars. Mendoza testified this man was taller than the other two and was wearing a polo shirt, which Mendoza thought was white. As the men moved behind the cars, Mendoza went back to the pizza restaurant to call the police. Mendoza testified that the other two men were "just standing, watching" and did not seem upset. They did not try to stop the attack. When Mendoza went back outside, he saw all five men running away. Mr. Benavides was "gargling," and there was blood underneath his mouth.

Mendoza was later shown a photo lineup by Investigator Anthony Carillo of the Laredo Police Department. Mendoza identified Justin Hernandez, appellant's brother, as the short man in the blue shirt who first punched Mr. Benavides.

Leticia Ayala testified that she also saw the attack on Mr. Benavides. According to Ayala, on November 14, 2015, she went to Rumors to meet a friend. She parked in an open spot as directed by Mr. Benavides. Going through her purse, she realized she did not have any cash to pay for parking. Mr. Benavides replied, "That's fine, just give it to me in a moment." He then walked away. Ayala picked up her phone to text her friend that she was outside when she "started hearing noises, like gravel on the floor, like [she] could just hear commotion." Ayala looked in her rearview mirror and "just saw action, people fighting." When she got out of her car, there were three men surrounding Mr. Benavides:

> They were all hitting him at once, and Mr. Benavides was fighting back, and they wouldn't stop. They kept hitting and hitting and hitting. Some–some were hitting, some were punching him, some were hitting him with an object and I kept calling

the bouncers' attention and for them to turn to tell them that they were hitting Mr. Benavides and they couldn't hear me. . . . The bouncers were right by the entrance; the music was loud.

Ayala testified that the men had Mr. Benavides between the cars. Mr. Benavides was trying to fight back and was covering his face to protect himself, but the men "kept punching and kicking him." She then saw Mr. Benavides slide toward the ground. Ayala testified she kept screaming at the men, "Stop it, stop it, stop it." Mr. Benavides "was kind of like in a fetal position on the floor" and the men "kept kicking and punching and hitting him with an object." She then heard two of the men tell the other one that they needed to leave. According to Ayala, one of the men took out some money, threw it on Mr. Benavides's chest, and said "Here's your f--king money."

Ayala described the men as "two short guys and a tall guy." The tall man was wearing a white shirt, one of the short men was wearing a "patterned shirt," and the other short man was wearing a solid shirt, which Ayala described as kind of a "Navyish," "darkish" color. Ayala testified the "short guy" threw the money, and the "tall one" yelled at her, "F--king bitch, you're going to get it." She saw the men run away. She ran to Mr. Benavides to help him. "His face was changing and he couldn't talk. He was just like moaning and taking deep breaths like that was it." Ayala told the police what she had seen and then left. When she was later shown a photo lineup, she was not able to identify anyone.

Rochelle Tellez testified that on November 14, 2015, she and her boyfriend, Roberto, met her friends Sara Hernandez and Belinda Martinez, along with their respective husbands (Appellant Efrain Hernandez and Felipe Arizpe-Rosales) at Rumors sometime between 10 p.m. and 11 p.m. They got some drinks and took some pictures. They had been at Rumors for about twenty minutes when Sara and her husband, Appellant Efrain Hernandez, decided to leave "because something had happened to Efrain's brother," Justin Hernandez. "They" told Tellez and her boyfriend they

were going to another bar, TKO.[1] According to Tellez, after Sara and Hernandez left, Belinda asked her where they had gone. Tellez told Belinda "they had left because something had happened with–with Efrain's brother." Belinda replied, "Well, let's go over there." Tellez said she would let them know if she and her boyfriend decided to go to TKO. Belinda and her husband, Felipe Arizpe-Rosales, then left. Tellez and her boyfriend stayed another ten to fifteen minutes before they decided to go meet up with the others at TKO.

Tellez testified that when she and her boyfriend arrived at TKO, they saw Sara, Belinda, and the wife of Justin Hernandez. Tellez did not, however, see any of the men. Tellez asked Belinda where her husband was. According to Tellez, she learned "that the guys had left to go back to Rumors because they were upset about something that had happened to Efrain's brother's truck." Tellez said the women "were like scared and nervous." The women remained at TKO for five or ten more minutes and then left "to go check on their guys to see what had happened." Tellez testified she and her boyfriend stayed at TKO for another twenty minutes before they also left. On the way home, Tellez passed by Rumors because she wanted to see "if something big had happened." There were "already ambulances and cops." She messaged Sara and Belinda, asking them what had happened. Tellez testified that "[t]hey" messaged her "that shit had gone down so [she] was kind of worried and stuff."

Tellez later learned from her father what had happened to Mr. Benavides. In a group message, she asked Sara and Belinda "if they were involved." "They" replied that "they had nothing to do [with it]." However, about a week later, she was in a class with Belinda when Belinda said, "I have to tell you—I have to tell you what happened." Tellez testified she asked Belinda to

---

[1] TKO is a bar and grill located less than a mile from Rumors.

not say anything. Nevertheless, Belinda told Tellez that Felipe, Efrain, and Justin "had gone and— like, I guess, fight Mr. Benavides."

Belinda's husband, Felipe Arizpe-Rosales, testified at trial that on November 14, 2015, he arrived at Rumors with Belinda in his pick-up truck to meet his wife's friends and their respective husbands. Because he parked on the side of a street, he had no contact with Mr. Benavides. While at Rumors, the group took pictures. In the photos, Felipe testified he was wearing a light blue shirt, and Hernandez was wearing a black shirt. According to Felipe, Hernandez's brother, Justin, was supposed to meet the group at Rumors, but did not show. Hernandez and his wife, Sara, then left Rumors by themselves. Belinda suggested they should follow Hernandez and Sara to TKO. Felipe testified that when he and Belinda arrived at TKO, he went to the restroom and saw Hernandez and his brother Justin. They were talking about how, at Rumors, Justin had been hit in the face and his truck had also been hit. They told Felipe they wanted to go back to Rumors "to talk with the owner so they could resolve the problem with the [person who] had hit Justin." Felipe, Justin, and Hernandez then left in Justin's truck. Justin parked his truck away from the Rumors parking lot. According to Felipe, he stayed behind while Hernandez and Justin approached Mr. Benavides in the parking lot. Felipe testified Hernandez and Justin began talking to Mr. Benavides in a "normal" voice when "all of a sudden" Justin punched Mr. Benavides in the face. Felipe then saw Justin and Hernandez hitting Mr. Benavides who tried to get away. Felipe testified he moved toward Justin and Hernandez to stop them. Felipe then saw Mr. Benavides fall to the ground while Justin and Hernandez continued to kick Mr. Benavides. When they stopped, Felipe ran back to where Justin's truck was parked. According to Felipe, Justin was behind him; Hernandez arrived a few moments later. They then went to Hernandez's house where Belinda later picked up Felipe. Felipe testified that they also took pictures at Hernandez's house after the attack. He admitted he, Hernandez, and Justin were all smiling in the pictures.

Investigator Anthony Carillo testified that on November 14, 2015, he spoke to Leticia Ayala and Christopher Benavides regarding the attack on Mr. Benavides. About two weeks later, he received a tip when a man called and said his daughter had information relating to the men who had attacked Mr. Benavides. The next day, Investigator Carillo met with Rochelle Tellez, and she gave him the names of Efrain Hernandez, Justin Hernandez, and Felipe Arizpe-Rosales. Investigator Carillo then spoke with Felipe, who stated he had witnessed Hernandez and Justin attack Mr. Benavides "because of the prior incident that happened in the parking [over] the charging [of] fees." Investigator Carillo then prepared photo lineups for Christopher Benavides, Leticia Ayala, and Patrick Mendoza. Patrick Mendoza identified Justin Hernandez. No one identified Appellant Efrain Hernandez. Investigator Carillo also testified that pursuant to a search warrant, police seized from Hernandez's home a long-sleeved black shirt that matched the shirt Hernandez was seen wearing in photos taken on the night of the attack.

## CORROBORATION OF ACCOMPLICE-WITNESS TESTIMONY

"An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state." *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). A witness is an accomplice as a matter of law in the following situations:

- If the witness has been charged with the same offense as the defendant or a lesser-included offense;

- If the State charges a witness with the same offense as the defendant or a lesser-included of that offense, but dismisses the charges in exchange for the witness's testimony against the defendant; and

- When the evidence is uncontradicted or so one-sided that no reasonable juror could conclude that the witness was not an accomplice.

*Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017). In this case, Felipe Arizpe-Rosales was indicted as a co-defendant and stated at trial that he was not testifying for the State in hopes of reducing his punishment. Therefore, he was an accomplice as a matter of law.

On appeal, Hernandez argues the evidence is legally insufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979), because there is no evidence that tends to connect Hernandez to the commission of the offense under the accomplice-witness rule. Hernandez, however, is conflating two separate issues: (1) whether the evidence is legally sufficient to support his conviction under *Jackson v. Virginia*, and (2) whether the accomplice-witness evidence is sufficiency corroborated under article 38.14 of the Texas Code of Criminal Procedure.

### A. *Jackson v. Virginia* Legal Sufficiency Standard

Under the *Jackson v. Virginia* sufficiency standard, uncorroborated accomplice witness testimony "can be sufficient to support a conviction." *Taylor v. State*, 10 S.W.3d 673, 684-85 (Tex. Crim. App. 2000); *see also Ramos v. State*, No. 04-17-00669-CR, 2019 WL 1779861, at *2 (Tex. App.—San Antonio Apr. 24, 2019, no pet. h.). That is, in a legal sufficiency review, we consider *all* the evidence—even improperly admitted evidence. *See Moff v. State*, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004) ("In applying the *Jackson* sufficiency review, an appellate court *must consider all evidence* which the jury was permitted, whether rightly or wrongly, to consider.") (emphasis in original) (citations omitted); *see also Ramos*, 2019 WL 1779861, at *2. Thus, for purposes of our legal sufficiency review under *Jackson v. Virginia*, we consider the accomplice-witness evidence presented by Felipe.

In assessing the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard recognizes the jury's role "as the sole judge of the weight

and credibility of the evidence after drawing reasonable inferences from the evidence." *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). Further, when we review the legal sufficiency of the evidence, "we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial." *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014). "A hypothetically correct jury charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*. (citations omitted). The "'law as authorized by the indictment' consists of the statutory elements of the offense and those elements as modified by the indictment." *Id*.

> As authorized by the indictment in this case, a person commits felony murder if he
>
> commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of the individual.

TEX. PENAL CODE ANN. § 19.02(b)(3). The underlying felony was aggravated assault by intentionally or knowingly causing serious bodily injury to another. *See id*. §§ 22.01(a)(1), 22.02(a)(1); *see also Lawson v. State*, 64 S.W.3d 396, 397 (Tex. Crim. App. 2001). In considering *all the evidence* presented to the jury, including the accomplice-witness evidence, there is more than sufficient evidence to show Hernandez committed aggravated assault by intentionally or knowingly causing serious bodily injury to Mr. Benavides, and in the course of and in furtherance of the commission of aggravated assault, committed an act clearly dangerous to human life, i.e. hitting and kicking Mr. Benavides, that caused the death of Mr. Benavides. Thus, we hold the evidence is legally sufficient to support Hernandez's conviction for felony murder.

### B. Accomplice Witness Rule

Article 38.14 of the Texas Code of Criminal Procedure provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14. This accomplice-witness rule "is not mandated by common law or the [United States Constitution]." *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998). "The rule reflects a legislative determination that accomplice testimony implicating another person should be viewed with a measure of caution, because accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person." *Id*.

Because the accomplice-witness rule is statutorily imposed, it "is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (citations omitted). "When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Id*. (citations omitted). "To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id*. "Rather, the evidence must simply link the accused in some way to the commission of the crime and show that 'rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.'" *Id*. (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)) (alteration in original). The non-accomplice evidence may be direct or circumstantial. *Smith*, 332 S.W.3d at 442. "[W]hen there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence." *Id*. "Therefore,

it is not appropriate for appellate courts to independently construe the non-accomplice evidence." *Id*. An appellate court may not offer "alternative, seemingly innocent explanations in certain instances [that are] in direct opposition to the jury's implicit determination in [the] case." *Id*.

Further, in considering the sufficiency of non-accomplice witness evidence, "'[e]ach case must be judged on its own facts.'" *Malone*, 253 S.W.3d at 257 (quoting *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)) (alteration in original). "There is no set amount of non-accomplice corroboration evidence that is required for sufficiency purposes." *Id*. The court of criminal appeals has "observed that circumstances that are apparently insignificant may constitute sufficient evidence of corroboration." *Id*. Additionally, while the court has held "mere presence alone of a defendant at the scene of a crime is insufficient to corroborate accomplice testimony," it has explained that "[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Id*. (citations omitted). If the non-accomplice evidence is insufficient to corroborate the testimony of the accomplice witness, "the defendant is entitled to an acquittal on appeal." *Taylor*, 10 S.W.3d at 685 (citing Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏᴄ. Aɴɴ. art. 38.17; *Munoz v. State*, 853 S.W.2d 558, 559-60 (Tex. Crim. App. 1993)).

The non-accomplice evidence in this case shows the following:

**(1) Hernandez was present at Rumors before the attack on Mr. Benavides.** Non-accomplice witness Rochelle Tellez testified that Hernandez was present at Rumors and in the company of Felipe before the incident. Tellez testified it was "around 10 or 11" p.m. Security camera footage from Rumors shows Hernandez entering Rumors at 10:49 p.m.

**(2) Mr. Benavides was attacked at about 12:27 a.m.** The 911 call reporting the attack on Mr. Benavides was placed at 12:27 a.m.

**(3) Hernandez, Justin, and Felipe "had gone and . . . [fought] Mr. Benavides."** A week after Mr. Benavides was attacked, Belinda told Tellez "pretty much" what had happened. Tellez testified that Belinda told her "the boys had gone and–like, I guess, fight Mr.

Benavides. But, I mean, she didn't go, like, into complete details." Tellez clarified that "the boys" referred to Hernandez, Justin, and Felipe.

**(4) The assailants wore white and dark shirts, respectively, which matched clothing worn by Hernandez and Felipe.** Bystander witnesses, Mendoza and Ayala, described the clothing worn by the assailants. Mendoza and Ayala testified the taller assailant was wearing a white shirt. Ayala testified one of the shorter men was wearing a solid "Navyish," "darkish" shirt. These generic descriptions are consistent with the clothing Felipe testified he and Hernandez wore that night and also with the clothing retrieved from Hernandez's and Felipe's respective homes.

**(5) Justin, Hernandez's brother, was identified as one of the men who attacked Mr. Benavides**. Bystander witness Mendoza identified Justin, Hernandez's brother, as one of the assailants.

**(6) Photos on Hernandez's iPhone show him at Rumors and with Felipe and Justin.** A download of Hernandez's iPhone was admitted in evidence as State's Exhibit 90. There are four photos on Hernandez's phone that match photos about which accomplice witness Felipe testified. One of the photos shows Felipe and Hernandez. Felipe testified this photo was taken at Rumors before the attack on Mr. Benavides. Another photo is of Felipe and his wife dancing. Felipe testified this photo was also taken at Rumors before the incident. The third photo shows Felipe and Hernandez in a home, and the fourth photo shows Felipe, Hernandez, and Justin. Felipe testified that these two photos were taken at Justin's house after the attack on Mr. Benavides.

**(7) Hernandez was communicating with Justin shortly after Mr. Benavides was attacked.** In addition to photos, the download of Hernandez's phone contained text messages between Hernandez and Justin. At 11:10 p.m., Justin texted Hernandez, "What time r u all taking off bro." Hernandez immediately replied, "Now." Twenty seconds later, Hernandez texted Justin again: "To rumors." Twelve seconds after that, Justin texted, "Where r u all going Elsa so going to change real quick I'll see U there I'll call u when we get there." At 12:34 a.m., seven minutes after the 911 call was placed, Hernandez texted Justin, "Donde están." About a minute later, Justin texted back, "Here by Shiloh."[2] Four minutes later, Hernandez replied, "Ok cool." Nine minutes later, at 12:48 a.m., Hernandez received an incoming phone call from Justin.

We conclude that taken as a whole, the non-accomplice evidence shows more than Hernandez's mere presence at the scene of the attack on Mr. Benavides. *See De La Fuente v. State*, 432 S.W.3d 415, 421-22 (Tex. App.—San Antonio 2014, pet. ref'd) (holding non-accomplice witness evidence that placed defendant at or near scene of murder, close in time to its commission, and in the

---

[2] Shiloh is a street in Laredo about half a mile away from Rumors.

company of a person charged as an accomplice to the murder was sufficient to corroborate accomplice-witness testimony). The jury could have rationally found that the corroborating evidence, combined with other suspicious circumstances as described herein, sufficiently tended to connect Hernandez to the offense.

We note that Hernandez argues much of Tellez's testimony was inadmissible hearsay and should not be considered as corroboration evidence. However, like in a *Jackson v. Virginia* sufficiency challenge, in considering whether there is sufficient evidence to corroborate accomplice-witness testimony, we do not consider whether the evidence was properly admitted. *See Medrano v. State*, 421 S.W.3d 869, 882-83 (Tex. App.—Dallas 2014, pet. ref'd) (explaining that like in a legal sufficiency review, "evidence, whether properly or improperly admitted," is considered in "a challenge to the sufficiency of the evidence to corroborate the testimony of an accomplice" witness). Instead, we "*eliminate the accomplice testimony from consideration* and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Malone*, 253 S.W.3d at 257 (emphasis added). Here, Tellez's testimony about what Hernandez's and Felipe's wives told her was non-accomplice witness evidence. While we agree that "an accomplice's testimony cannot be corroborated by prior statements made by the accomplice witness to a third person," *Smith*, 332 S.W.3d at 439, as such would constitute "accomplice evidence," there is nothing in this record to indicate that Tellez's testimony was based on statements made by the accomplice witness (Felipe).[3]

---

[3] While Tellez is clear in her testimony that she learned this information from Belinda and Sara, the record is unclear how Belinda and Sara learned the information. Hernandez argues in his brief that Belinda learned the information from her husband, Felipe. In making this argument, however, Hernandez is making an assumption that Belinda learned the information from Felipe and not from, for example, her friend Sara.

We hold the non-accomplice witness evidence tends to connect Hernandez with the commission of the offense of felony murder.

### HEARSAY

In his second issue, Hernandez argues the trial court abused its discretion in overruling his hearsay objections during Tellez's testimony. We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016). A trial court's decision is an abuse of discretion only when it falls outside the zone of reasonable disagreement. *Id*. at 83. We must uphold a trial court's evidentiary ruling if it is correct under any theory of law applicable to the case. *Id.* at 93.

During Tellez's testimony, the State asked her whether a conversation took place that caused her to pass by Rumors on the way home on the night of the incident. The defense objected to hearsay. The State argued the statement was not being offered for the truth of the matter asserted, but only to explain why Tellez passed by Rumors. Defense counsel pointed out that Tellez had already testified she passed by Rumors on the way home. The State argued the text gave Tellez a reason for going to Rumors. At a bench conference, the State explained Tellez was the anonymous source and heard "certain things" that caused her to drive by Rumors and eventually go to the police. The trial court then asked the prosecutor what Tellez's statement would be if allowed. The prosecutor replied, "I think – I can't remember exactly who said exactly what, but the gist of it was that they were going back to Rumors." The trial court noted that the "objection is to hearsay, the hearsay is as to – because who is telling her all this?" The prosecutor responded, "Sara is telling her." The trial court then turned to defense counsel and confirmed the objection was to hearsay. The trial court asked the prosecutor, "So you're offering it to prove what again?" The prosecutor, replied, "It's to explain all her actions and how this anonymous call developed. This is the basis of the investigation, really. . . ." The trial court ruled that the statement would be allowed because

it was not being offered for the truth of the matter asserted. The trial court then gave the jury a limiting instruction, explaining that Tellez's response to the question about to be asked by the prosecutor should not be considered as the truth of the matter asserted but only to explain the witness's state of mind.

Tellez then testified she spoke to "Belinda and Sara" at TKO and "they" told her "the guys had left to go back to Rumors because they were upset about something that had happened to Efrain [Hernandez]'s brother's truck." When asked to describe the demeanor of both Sara and Belinda, Tellez testified that "[t]hey were like scared and nervous." Tellez testified she then went home and messaged Belinda and Sara, asking them what had happened. According to Tellez, they messaged her "that shit had gone down." Tellez continued to testify that a week later, Belinda approached her and said she had to tell her what had happened. Defense counsel then objected again to hearsay. The trial court sustained the objection "at this time." The prosecutor asked to develop the testimony to show why the statements were not hearsay. In response to the prosecutor's questions, Tellez testified that what Belinda told her made her feel "very scared" because she had seen on Facebook what had happened to Mr. Benavides. Tellez testified she then "went ahead and called" the investigator. The prosecutor once more argued that Tellez should be able to testify about the statements Belinda made to her "not for the truth of the matter asserted, but again [because] it goes to the crux of the investigation and how [the police] got names and how they ended up with these three names as the suspects." The defense objected that the testimony was, in fact, being offered for the truth of the matter asserted. At another bench conference, the trial court again asked the prosecutor what the testimony would be if admitted. The prosecutor replied, "The wife told her that the three were involved." The trial court asked, "And that's it?" The prosecutor stated, "Yeah, that they were involved in the beating–that's what I expect her to say and that all her fears were true and she had a talk with her dad and decided to [come] forward [and go] to the

police and say what she knows." The trial court overruled the hearsay objection. However, it did not give a limiting instruction to the jury, and the defense did not request one.[4] Tellez then testified Belinda told her "pretty much like what had happened . . . that the boys had gone and–like, I guess, fight Mr. Benavides." Tellez clarified "the boys" referred to Hernandez, Justin, and Felipe.

We must first consider whether Hernandez has preserved error on appeal. *See* TEX. R. APP. P. 33.1. Although a complaining party usually needs to object each time inadmissible evidence is offered, the court of criminal appeals has explained "two exceptions apply to the requirement of subsequent objections: counsel may obtain a running objection or request a hearing outside the presence of the jury" under Texas Rule of Evidence 103.[5] *Haley v. State*, 173 S.W.3d 510, 517 (Tex. Crim. App. 2005). According to the court, a bench conference is considered "a hearing outside the presence of the jury" and thus satisfied Rule 103. *Haley*, 173 S.W.3d at 517. Here, the trial court held two bench conferences, heard the hearsay objections, and questioned the State specifically about the statements about to be made by the witness. The trial court was also aware of the context of the statements, having specifically asked the prosecutor who told the witness the

---

[4] Texas Rule of Evidence 105 provides that if a court "admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on request, must restrict the evidence to its proper scope and instruct the jury accordingly." TEX. R. EVID. 105(a). When a court "admits the evidence without restriction," a "party may claim error in a ruling to admit evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—only if the party requests the court to restrict the evidence to its proper scope and instruct the jury accordingly." TEX. R. EVID. 105(b)(1). The court of criminal appeals has held that the "party opposing evidence has the burden of objecting and requesting the limiting instruction at the introduction of the evidence." *Hammock v. State*, 46 S.W.3d 889, 892 (Tex. Crim. App. 2001); *see also Washington v. State*, 567 S.W.3d 430, 442 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd); *Salazar v. State*, 330 S.W.3d 366, 367 (Tex. App.—San Antonio 2010, no pet.). According to the court of criminal appeals, "[o]nce evidence is received without a limiting instruction, it becomes part of the general evidence and may be used for all purposes." *Hammock*, 46 S.W.3d at 892. In this case, even though the State argued at this second bench conference that Tellez's testimony was not hearsay because it was not being offered for the truth of the matter asserted, her statement that Hernandez was one of the men who had gone to fight Mr. Benavides could be used for all purposes by the jury because Hernandez did not request a limiting instruction. *See id*.

[5] Rule 103 provides, in part, the following: "When the court hears a party's objections outside the presence of the jury and rules that evidence is admissible, a party need not renew an objection to preserve a claim of error for appeal." TEX. R. EVID. 103(b).

information. *See Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009). We therefore hold

Hernandez preserved error for appeal.[6]

Texas Rule of Evidence 801 defines hearsay as a statement that

(1) the declarant does not make while testifying at the current trial or hearing; and
(2) a party offers in evidence to prove the truth of the matter asserted[7] in the
statement.

TEX. R. EVID. 801(d). "Thus, a statement not offered to prove the truth of the matter asserted is not

hearsay." *Davis v. State*, 169 S.W.3d 673, 675 (Tex. App.—Fort Worth 2005, no pet.) (citing

*Dinkins v. State*, 894 S.W.2d 330, 347-48 (Tex. Crim. App. 1995)).

The State argues on appeal that the complained-of testimony by Tellez was admissible "as

non-hearsay to show a purpose other than the truth of the matter asserted: why the police began

the investigation." The court of criminal appeals "has concluded that if a statement is introduced

to explain how a defendant became a suspect or how the investigation focused on a defendant, then

the statement is not hearsay because it is not offered for the truth of the matter asserted." *Nickerson*

*v. State*, 312 S.W.3d 250, 262 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *see also Dinkins*,

894 S.W.2d at 347 (appointment book and patient application not hearsay because offered to show

how defendant became suspect in investigation); *Jones v. State*, 843 S.W.2d 487, 499 (Tex. Crim.

App. 1992) (testimony not hearsay because offered to explain how police officer began to suspect

the defendant), *abrogated on other grounds by Maxwell v. State*, 48 S.W.3d 196 (Tex. Crim. App.

2001); *Davis*, 169 S.W.3d at 676-77 (holding detective's testimony regarding anonymous tips

received by police identifying defendant as perpetrator was not hearsay because testimony was

---

[6] We note that in his brief, Hernandez argues that he was denied effective assistance of counsel if we believe he failed to preserve this issue for appeal. Having held that Hernandez preserved the issue for appeal, we need not consider Hernandez's alternative argument that he was denied effective assistance of counsel.

[7] "Matter asserted" is defined as "(1) any matter a declarant explicitly asserts; and (2) any matter implied by a statement, if the probative value of the statement as offered flows from the declarant's belief about the matter." TEX. R. EVID. 801(c).

offered to show why investigation focused on Davis); *Cano v. State*, 3 S.W.3d 99, 110 (Tex. App.—Corpus Christi–Edinburg 1999, pet. ref'd) (testimony not offered to prove drugs were being distributed but rather to show why officers focused their investigation on defendant). "This type of testimony assists the jury's understanding of the events by providing context for the police officer's actions." *Nickerson*, 312 S.W.3d at 263 (quoting *Cano*, 3 S.W.3d at 110). Here, Tellez's testimony related to why she went to the police and named Hernandez, Justin, and Felipe as assailants involved in the attack on Mr. Benavides. Because the complained-of testimony established how Hernandez became a suspect in this case, it is not hearsay. Therefore, we find no error by the trial court in overruling Hernandez's objections.

### JURY CHARGE

In his third issue, Hernandez contends that errors in the jury charge caused him egregious harm. In reviewing a jury charge issue, we first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we find error, then we analyze that error for harm. *Id.* "The degree of harm necessary for reversal depends on whether appellant preserved the error by objection." *Id.* When an appellant preserved error, we will reverse if the record shows "some harm" to the appellant's rights. *Id.* However, when an appellant has failed to preserve error, we will reverse only if the record shows the appellant suffered "egregious harm." *Id.* In this case, Hernandez did not preserve the errors of which he complains on appeal. Therefore, he is entitled to reversal of the trial court's judgment only if the error "was so egregious and created such harm that [he] was deprived of a fair and impartial trial." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015).

Hernandez argues the trial court erred in failing (1) to limit the definitions of "intentionally" and "knowingly" to the result of the conduct, and (2) to include the law of parties in the application portion of the jury charge. In relevant part, the jury charge read as follows:

1.
## Definitions

. . .**"Intentionally"** [A] person acts intentionally, or with intent, with respect to *the nature of his conduct* when it is his conscious objective or desire to engage in the conduct.

**"Knowingly"** [A] person acts knowingly, or with knowledge, with respect to *the nature of his conduct* or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to *a result of his conduct* when he is aware that his conduct is reasonably certain to cause the result.

**"Serious bodily injury"** means a bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

**"Felony"** means an offense so designated by law or punishable by confinement in a penitentiary.

Any words not specifically defined herein are to be understood as ordinary usage allows, and jurors are free to use any meaning, which is acceptable in common speech.

2.
A person commits the offense of felony murder if he commits or attempts to commit an act clearly dangerous to human life that caused the death of an individual, and the defendant was then and there in the course of intentionally or knowingly committing a felony. . . .

A person commits Aggravated Assault if he intentionally or knowingly causes serious bodily injury to another.

Aggravated Assault is a felony offense. . . .

4.
A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if: acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense.

Mere presence alone will not constitute one a party to an offense.

5.

Now bearing in mind the foregoing instructions, if you believe from the evidence, that the Defendant, EFRAIN LEONEL HERNANDEZ, on or about the 15th day of November, A.D., 2015, in the county of Webb and State of Texas, as alleged in the indictment, did then and there intentionally or knowingly commit a felony, to wit: Aggravated Assault and, in the course of and in furtherance of the commission of said offense, committed an act clearly dangerous to human life, namely, by using his hands, and/or feet, and/or knee, and/or an unknown object to strike the head, and/or face, and/or upper body of Hector Benavide[s] Sr., and said death of Hector Benavide[s] Sr. was caused by the act clearly dangerous to human life, then you will find the Defendant "Guilty" of the offense of Murder and say so by your verdict, but if you do not so find, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

(emphasis added).

### A. Does error exist?

Hernandez argues the jury charge used "the wrong definition" of "intentionally" and "knowingly." According to Hernandez, the jury charge should have instructed that a person acts intentionally, or with intent, with respect to the *result of his conduct* when it is his conscious objective or desire to *cause the result*. Hernandez further argues that with respect to "knowingly," the jury charge should have instructed only that a person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Thus, Hernandez contends the trial court should not have instructed the jury that a person "acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when *he is aware of the nature of his conduct* or that the circumstances exist." (emphasis added). We agree with Hernandez.

"Felony murder is, essentially, an unintentional murder committed in the course of committing a felony." *Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014) (citation omitted). The felony murder statute, section 19.02(b)(3) of the Penal Code, "plainly dispenses with a culpable mental state." *Lomax v. State*, 233 S.W.3d 302, 305 (Tex. Crim. App. 2007); *see Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) (explaining that felony murder

is an "unintentional" murder committed in the course of a felony). It is "the underlying felony itself, and not the felony-murder statute, that determines whether the underlying felony requires a culpable mental state." *Lomax*, 233 S.W.3d at 307. As indicted in this case, the underlying felony was aggravated assault by causing serious bodily injury. *See* TEX. PEN. CODE ANN. §§ 22.01(a)(1), 22.02(a)(1). Aggravated assault by causing serious bodily injury, whether intentionally or knowingly committed, is a result-oriented offense. *See Garfias v. State*, 424 S.W.3d 54, 60 (Tex. Crim. App. 2014) (explaining that "an assaultive offense by threat is a conduct-oriented offense, while an assaultive offense causing bodily injury is a result-oriented offense"); *see also Shelby v. State*, 448 S.W.3d 431, 438 (Tex. Crim. App. 2014) ("The gravamen of aggravated assault . . . is either causing bodily injury or threatening imminent bodily injury, depending on which theory has been pleaded in the charging instrument"). "A trial court errs when it fails to limit the language in regard to the applicable culpable mental states to the appropriate conduct element." *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015). "If the gravamen of an offense is the result of conduct, the jury charge on culpable mental state should be tailored to the result of conduct and likewise for nature-of-conduct offenses." *Id.* Therefore, by failing to tailor the definitions of "intentionally" and "knowingly" to the result of conduct, the trial court erred. *See id.*

Additionally, Hernandez contends the trial court erred by failing to include the law of parties in the application portion of the jury charge. In essence, Hernandez complains the application paragraph lacked the phrase "acting alone or as a party." The court of criminal appeals has explained that when "a definition or instruction on a theory of law—such as the law of parties—is given in the abstract portion of the charge, the application paragraph" must do one of the following:

> (1) specify all of the conditions to be met before a conviction under such theory is authorized;

(2) authorize a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers; or

(3) contain some logically consistent combination of such paragraphs.

*Vasquez v. State*, 389 S.W.3d 361, 368 (Tex. Crim. App. 2012) (quotations omitted). "Thus, if the application paragraph necessarily and unambiguously refers to another paragraph of the jury charge, then a conviction is authorized, and the trial judge need not *sua sponte* 'cut and paste' that definition into the application paragraph." *Id.* (quotations omitted).

Accordingly, "an application paragraph that incorporate[s] the law of parties by stating that the defendant 'either acting alone or as a party, as that term has been defined,' sufficiently applie[s] the law of parties to the facts of the case." *Id*. Conversely, "an application paragraph that ma[kes] no mention of the law of parties 'either directly or by reference . . . for an offense committed by the conduct of his codefendant,' [is] erroneous." *Id.* at 368 (quoting *Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997)). "In sum, a general reference to the law of parties in the application paragraph is sufficient and is not error when the defendant does not object and request a narrowing of the specific statutory modes of conduct that constitute party liability—whether he 'solicited, encouraged, directed, aided or attempted to aid' another specified person to commit the offense." *Id*.

Here, the application paragraph began with the phrase "[n]ow bearing in mind the foregoing instructions"; that phase, however, even when not objected to by the defendant, does not sufficiently incorporate the law of parties. *See id*. Therefore, we conclude the trial court also erred in failing to include the law of parties in the application paragraph.

### B. *Did Hernandez suffer egregious harm?*

Having found unpreserved errors in the jury charge, we must now determine whether the errors were "so egregious and created such harm that [Hernandez] was deprived of a fair and impartial trial." *Villarreal*, 453 S.W.3d at 433. "Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id*. "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id*. (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). "We will not reverse a conviction unless the defendant has suffered 'actual rather than theoretical harm.'" *Id*. (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)). In examining the record to determine whether charge error has resulted in egregious harm to the appellant, we consider the following factors enunciated in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g):

(1) the entirety of the jury charge;

(2) the state of the evidence, including the contested issues and weight of probative evidence;

(3) the arguments of counsel; and

(4) any other relevant information revealed by the trial record as a whole.

First, in considering the entirety of the jury charge, we note that although the law of parties was not referenced in the application paragraph, "the abstract portion did correctly explain the circumstances under which one person can be held criminally responsible for another's actions." *Payton v. State*, No. 03-17-00322-CR, 2018 WL 3432020, at *3 (Tex. App.—Austin 2018, no pet.) (not designated for publication). Further, the abstract paragraph explaining the law of parties is immediately before the application paragraph, and the application paragraph begins with the phrase "[n]ow bearing in mind the *foregoing instructions*." *See id*. (noting "the instructions on the

law of parties immediately preceded the application paragraph" and "the application paragraph did reference 'the foregoing instructions,' asking the jurors to bear in mind the abstract portion of the charge when applying the law to the facts"). Thus, we "conclude a reasonable jury would refer to the abstract definition of the law of parties without needing to have it repeated again in the application paragraph." *Vasquez*, 389 S.W.3d at 371; *see also Payton*, 2018 WL 3432020, at *3.

With regard to the definitions of the applicable culpable mental states, we note that the Texas Court of Criminal Appeals has held "an error in the abstract paragraph is not egregious" "[w]here the application paragraph correctly instructs the jury." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999). Thus, in a capital murder case where the charge had erroneously defined "knowingly" as to the nature of the appellant's conduct and not the result of his conduct, the court of criminal appeals found no egregious harm, explaining that the application paragraph had "instructed the jury that they must believe beyond a reasonable doubt that appellant 'intentionally or knowingly caused the death' before they could find him guilty." *Id*. Similarly, in a recent opinion, the Thirteenth Court of Appeals considered in a felony murder case whether the appellant was egregiously harmed by the jury charge erroneously failing to limit the definitions of culpable mental states to the result of the conduct. *Alvarez v. State*, No. 13-18-00053-CR, 2019 WL 1831749, at *6 (Tex. App.—Corpus Christi–Edinburg Apr. 25, 2019, no pet. h.) (not designated for publication). The court of appeals noted that the application paragraph in the jury charge instructed the jury that, in order to find the appellant guilty of felony murder, the jury needed to find beyond a reasonable doubt that the appellant, as alleged in the indictment, did then and there:

1. commit the felony offense of:
   a. Intoxication Assault of [Y.C.]; and/or
   b. Aggravated Assault of [Y.C.] with a deadly weapon; and/or
   c. Aggravated Assault of [Y.C.] *causing* serious bodily injury.

*Id.* (emphasis in original). The court emphasized "the application paragraph correctly *pointed the jury's focus to the result caused by appellant's conduct by the use of the word 'causing.'" Id.* (emphasis added). In this case, the application paragraph likewise pointed the jury's focus to the result caused by Hernandez's conduct through the use of the word "causing":

> Now bearing in mind the foregoing instructions, if you believe from the evidence, that the Defendant, EFRAIN LEONEL HERNANDEZ, on or about the 15th day of November, A.D., 2015, in the county of Webb and State of Texas, as alleged in the indictment, did then and there *intentionally and knowingly commit a felony*, to wit: Aggravated Assault and, in the course of and in furtherance of the commission of said offense, *committed an act clearly dangerous to human life*, namely, by using his hands, and/or feet, and/or knee, and/or an unknown object to strike the head, and/or fact, and/or upper body of Hector Benavide[s] Sr., and said *death of Hector Benavide*[s] *Sr. was caused by the act clearly dangerous to human life*, then you will find the Defendant "Guilty" of the offense of Murder and say so by your verdict, but if you do not so find, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

(emphasis added).

Second, with regard to the state of the evidence, the contested issues in this case did not revolve around whether the men who attacked Mr. Benavides acted with the requisite culpable mental state or whether they acted in concert as parties. Instead, the contested issue was one of identity—whether Hernandez was one of the men who attacked Mr. Benavides. Thus, the errors in the charge were not contested issues in the case.

Third, the State's closing argument in this case focused on the injuries to Mr. Benavides and the fact that they were caused by the beating he suffered. The State emphasized the primary injuries were to his head, which caused his brain to bleed and ultimately resulted in his death. The State discussed the law of parties and its applicability in this case. Thus, the State argued Mr. Benavides's death was a result of Hernandez committing an act clearly dangerous to human life. In its closing, the defense argued that Hernandez was not one of the assailants and the only evidence identifying him as an assailant came from an accomplice, Felipe, who had reason to lie.

Therefore, in their closing arguments, the parties did not focus on the issue of culpable mental state, but rather on identity. Further, the State in its closing discussed the law of parties, informing the jury it applied in this case.

With regard to the fourth factor, neither the State nor Hernandez points to any other relevant information. In considering the factors above, we conclude the record does not reveal "actual harm" suffered by Hernandez. *Villarreal*, 453 S.W.3d at 433. Therefore, we hold the errors in the jury charge were not "so egregious and created such harm that [Hernandez] was deprived of a fair and impartial trial." *Id.*

### MOTION FOR CONTINUANCE

In his last issue, Hernandez argues the trial court erred in denying his written motion for continuance. On November 13, 2017, the trial court held a status conference. Defense counsel explained Hernandez, Justin, and Felipe had been housed in Zapata County, and he believed jail phone calls from the Zapata County jail had not been turned over to him by the State. Defense counsel noted that the State was going to check whether there were jail phone calls from Zapata County. The trial court noted that trial was set for December 11th and asked whether the parties would be ready. Defense counsel replied, "Yes, Judge." On December 4th, defense counsel filed a verified motion for continuance, representing that on November 28th, he received jail calls from Zapata County. According to counsel, 282 calls were provided—each call lasted an average of fifteen minutes. Counsel further represented that no calls from Felipe were provided even though Felipe was also detained in Zapata County. Defense counsel also argued in his motion that he had recently learned Felipe had been housed in Maverick County and needed time to see if Felipe had made any phone calls while in jail at that facility.

In his brief, Hernandez claims that on December 5th, a conference was held in the judge's chambers where he argued that (1) he needed more time to review jail calls from the Webb County

Jail and (2) Felipe's jail calls from Zapata County were still missing and more time was needed to obtain them. Hernandez claims in his brief that the trial judge denied his motion for continuance at this conference, and because of this denial of his motion, he informed the judge and the State that his client accepted the State's plea-bargain offer. According to Hernandez, the State requested an email to formalize the plea-bargain agreement. In support of these factual assertions, Hernandez points to the appendix to his brief where he has attached (1) an affidavit from his trial counsel, (2) a text message from his trial counsel accepting the State's offer; (3) an email from his trial counsel to the prosecutor; and (3) a copy of a text message sent to his trial counsel by the prosecutor rescinding the plea-bargain offer. None of this evidence, however, is included in the appellate record; thus, we cannot consider it on appeal.

The appellate record does reflect that on December 11th, the day of trial, defense counsel announced "not ready" and urged the trial court to consider his written motion for continuance. He argued on November 28th, he had received 282 jail calls regarding Hernandez and Justin. He asked that the information he downloaded from that email be admitted as Exhibit 1. He argued, however, that he had not received any jail calls with respect to Felipe and thus would not be able to cross-examine Felipe with anything that may be reflected on those jail calls. The State responded that defense counsel had been given jail calls for Hernandez, Justin, and Felipe. It had confirmed that fact with the Webb County Sheriff and uploaded additional phone calls on December 6th. The State did not know if there were any jail calls made by Felipe in Zapata County, but it knew that it had given everything it had to defense counsel. The trial court then noted that defense counsel was assuming Felipe had made phone calls during the short time he was in jail in Zapata County. Defense counsel agreed he was assuming that Felipe had made jail calls from Zapata County Jail. The trial court denied his motion for continuance.

"A criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown[.]" TEX. CODE CRIM. PROC. ANN. art. 29.03. We review a trial court's decision to deny a motion for continuance under an abuse of discretion standard. *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006). To show an abuse of discretion, an appellant must show that he was actually prejudiced by the denial of his motion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007).

In support of his showing that he was actually prejudiced by the denial of his motion for continuance, Hernandez points to a jail call where Felipe told Belinda he asks "God to forgive me for all I've done." However, Felipe's general statement about asking God for forgiveness does not show prejudice to Hernandez. Hernandez also claims the jail calls show Belinda "unequivocally does not know that happened" on the night in question, which he argues is inconsistent with Tellez's testimony. However, Hernandez does not cite to the jail calls showing Belinda's lack of knowledge.[8] *See* TEX. R. APP. P. 38.1(i). Hernandez points to a jail call between Felipe and his brother where Felipe is crying and asking his brother for forgiveness. Again, Hernandez does not point to specific evidence that shows actual prejudice. Finally, Hernandez argues that "additional time to listen to the calls would [have] help[ed] [his trial] counsel know the position and conviction—or lack thereof—[Felipe] Arizpe would have, and this would [have] guide[d] Hernandez as to his decision in this case to take a plea or to help counsel with his defense." However, Hernandez represents that he did attempt to enter into a plea-bargain agreement, but that the State failed to go through with the agreement. Further, Hernandez does not show how he would have helped with his defense and how his lack of help prejudiced his case. Because Hernandez has

---

[8]All the jail calls are contained in the appellate record as a bill of exception.

not shown that he was actually prejudiced by the denial of his motion for continuance, we find no abuse of discretion by the trial court.

## CONCLUSION

We therefore hold the following: (1) the evidence was legally sufficient to support Hernandez's conviction for felony murder; (2) the non-accomplice evidence was sufficient to corroborate the accomplice-witness testimony; (3) the trial court did not abuse its discretion in allowing Tellez to testify about statements made to her because they were not hearsay; (4) Hernandez did not suffer egregious harm as a result of the erroneous jury charge; and (5) the trial court did not abuse its discretion in denying Hernandez's motion for continuance. Accordingly, we affirm the judgment of the trial court.

Liza A. Rodriguez, Justice

Publish